**MEGAPULSE, INC., Appellant,**

v.

**Drew LEWIS, Secretary of Transportation, et al.**

**No. 81–1030.**

United States Court of Appeals, District of Columbia Circuit.

Argued 20 Oct. 1981.

Decided 29 Jan. 1982.

---

Thomas Patton, Washington, D. C., with whom Paul G. Dembling and Stefan M. Lopatkiewicz, Washington, D. C., were on the brief for appellant.

Valerie K. Schurman, Asst. U.S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U.S. Atty., Royce C. Lamberth and Kenneth M. Raisler, Asst. U.S. Attys., and David Brochstein, Atty., U.S. Coast Guard, Washington, D. C., were on the brief for appellees.

Before BAZELON, Senior Circuit Judge, and WILKEY and WALD,* Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Appellant challenges the district court's refusal to issue a preliminary injunction against the United States Coast Guard enjoining the release of certain technical data without restrictions protecting Megapulse's claimed proprietary commercial rights in that data. The district court denied appellant's motion for preliminary injunction and granted the Government's motion for summary judgment on the ground that it had no subject matter jurisdiction in this case. For reasons outlined in detail below, we hold that the district court erred in this conclusion. We reverse and remand for further proceedings on the merits.

* Judge Wald took no part in the disposition of this case.

1. It is uncontested that this device was developed solely with private funding, prior to any contract between Megapulse and the Coast Guard.

## I. BACKGROUND

A. *Facts*

Megapulse, Inc. is a corporation founded by Dr. Paul Johannessen for the development, manufacture, and sale of long-range (Loran) navigation transmitter equipment embodying a pulsing circuit system known as a megatron, developed by Dr. Johannessen.

Feeling that his development in transmission circuitry might have valuable military as well as commercial application, Johannessen invited the Coast Guard in May 1970 to witness a demonstration of a Loran-C type transmitter utilizing the megatron.[1] As a result of this demonstration, Megapulse and the Coast Guard entered into a series of agreements, beginning in August 1970, for the demonstration and development of megatron transmitter technology for government-use power levels.

The first contract required Megapulse to construct and test a demonstration model Loran-C transmitter and submit a report with test results and recommendations. Two provisions of this contract related to technical data. One listed several patents and patent applications on which the demonstration model was based and stated that

> [w]hile the U.S. Coast Guard will be granted rights to data relating to the demonstration model transmitter to be constructed under the proposed contract the use of the same will be subject to the above patent rights under which no license is hereby granted at this time other than freely to use the demonstration model transmitter.[2]

A second provision granted the government the right to "duplicate, use and disclose in any manner and for any purpose whatsoever, and have others so do, all or any part of the technical data delivered by the Contractor to the Government under this contract."[3]

2. Joint Appendix (J.A.) at 99.

3. *Id.* at 101.

Additional contracts were entered into in January and September 1971 containing similar provisions relating to rights in data. The final contract, dated 5 December 1975, required the delivery of a pre-production prototype and provided that all data first produced in performance of the contract would become the property of the government. Data not first produced in performance of the contract was to remain property of the contractor; the government were to acquire the right to use them and to authorize others to use them unless the data were entitled to limit rights protection at the time they were delivered to the government. A portion of the engineering drawings and specifications submitted by Megapulse under the contract in November 1977 was marked with a legend, "limited rights data."

In the Spring of 1978 the parties entered negotiations on the form of the license agreement to be issued by Megapulse to prospective bidders on a contract to supply Loran-C transmitters to the Coast Guard. The appellant claimed limited rights protection for a comprehensive list of data at that time, apparently without opposition from the Coast Guard. In August 1978 the Coast Guard announced a procurement of Loran-C transmitters which included notification that those wishing to bid would be required to execute licenses before receiving the data package. The required licenses preserved Megapulse's commercial rights in those portions of the data package in which it claimed a valid proprietary interest.

After several bidders objected to the terms of the licenses,[4] the Coast Guard informally reviewed the proprietary status of the "limited rights" data and determined that it was unlikely that significant portions of the processes described in that data were developed entirely at Megapulse's expense. As a result of this determination, the Coast Guard advised Megapulse in May 1979 that it would remove all restrictions against commercial use of its proprietary data in the bid solicitation. Megapulse protested this decision to the General Accounting Office (GAO) on 29 May 1979, and filed suit in the United States District Court for the District of Columbia to enjoin the Coast Guard's release of the proprietary data pending the GAO decision. Following a preliminary hearing, the government agreed not to issue the solicitation without protecting the data pending resolution of the GAO protest; Megapulse withdrew its motion before the district court.

On 15 January 1980 the GAO issued an opinion denying appellant's protest on the ground that Megapulse had failed to meet its burden of showing no reasonable basis for the agency's determination that the data were not entitled to limited rights treatment.[5] Following a 28 May 1980 GAO denial of Megapulse's request for reconsideration, Megapulse once again filed an action for injunctive relief in the district court, founding subject matter jurisdiction on, inter alia, 28 U.S.C. § 1331[6] and 5 U.S.C. § 702.[7] Notice by the Coast Guard on 2 October 1980 of its intention to proceed with the solicitation by about 1 December

---

4. At least one competitor, ITT, filed a Freedom of Information Act request seeking access to the data in question, see J.A. at 209.

5. Appellant's protest to the GAO sought an advisory interpretation of the contract clauses, but it was pursued without distinction between Megapulse's interests in data preexisting its contractual relationship with the Coast Guard and that developed under the party's several contracts.

6. 28 U.S.C. § 1331(a) (1976) provides:

The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or trea-

ties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

7. 5 U.S.C. § 702 (1976) provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed

1980[8] precipitated Megapulse's motion for preliminary injunction.

In connection with its motion for preliminary injunction, Megapulse identified, out of approximately 4,000 documents delivered to the Coast Guard, six specific drawings in the solicitation data package, restriction on release of which would at least minimally protect its commercial interests in the methods and techniques for manufacturing the megatron.[9] It argued that unrestricted release of this data violates the Trade Secrets Act[10] and deprives Megapulse of its property without due process of law.

B. *Disposition by the District Court*

The district court indicated at oral argument on appellant's motion for preliminary injunction that Megapulse had set out a case for injunctive relief if the court had power to address the merits of the case.[11] The key issue, however, was whether the court had subject matter jurisdiction over plaintiff's claim.

The court noted that the Supreme Court's decision in *Chrysler Corp. v. Brown*[12] held that a district court has jurisdiction to enjoin an alleged violation of the Trade Secrets Act. It also noted, however, the "well-established rule [under the Tucker Act] that jurisdiction over government contract disputes lies exclusively in the Court of Claims, which cannot issue an injunction."[13] Faced with the question of whether a government contractor can step outside

nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

8. J.A. at 165–66.

9. Megapulse claims that the pulsing circuitry embodied in the megatron unit, and particularly the processes and techniques for manufacturing that circuitry, are trade secrets not capable of discovery by reverse engineering. It also stated that the megatron technology is the "commercial life blood" of Megapulse and that disclosure of the technology could result in destruction of Megapulse as a viable commercial entity.

10. 18 U.S.C. § 1905 (Supp. IV 1980). This Act provides:

Whoever, being an officer or employee of the United States or of any department or agency thereof, . . . publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with,

such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

11. J.A. at 195.

12. 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (hereinafter *Chrysler*).

13. *Megapulse, Inc. v. Goldschmidt*, No. 80–1543, mem. op. at 5 (D.D.C., 8 Jan. 1981) (hereinafter "mem. op."). The Tucker Act, 28 U.S.C. §§ 1346, 1491 (1976), provides in pertinent part:

[§ 1346] (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of: . . . (2) Any . . . civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of any executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. . . .

[§ 1491] The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Con-

the Tucker Act and seek an injunction in the district court to prevent an alleged violation of the Trade Secrets Act when the data involved were originally provided to the government pursuant to the terms of various contracts, the district court described it as a "close and difficult question whether the logic in *Chrysler* should be extended to allow this court to find jurisdiction in the present case." [14] In the end, the court found room to distinguish *Chrysler*,[15] and felt compelled to follow this court's position in *International Engineering Co., Division of A–T–O, Inc. v. Richardson*,[16] which found under facts similar to those of the instant case that the district court had no jurisdiction to enjoin agency disclosure of information. Appellant challenges the district court's conclusion and the propriety of its adherence to *International Engineering*.

## II. ANALYSIS

The ultimate issue in this case was clearly described by the district court: "whether a party to a government contract can seek an injunction in [district] court to prevent an alleged violation of the Trade Secrets Act when the disputed data was [sic] divulged to the government in order to fulfill the terms of various contracts." [17] As simply as

it is stated, this single issue actually combines two separate inquiries: (1) Does the district court have subject matter jurisdiction over Megapulse's request for injunctive relief? (2) If so, is the district court's jurisdiction limited in any way by sovereign immunity? [18] We address each in turn.

### A. Subject Matter Jurisdiction

Megapulse, relying upon the Supreme Court's opinion in *Chrysler*, argues that the district court has subject matter jurisdiction under 28 U.S.C. § 1331(a) (federal question jurisdiction). The Government counters with an argument that *Chrysler* does not apply under the facts of this case and that the district court was correct in adhering to this court's holding in *International Engineering*. As a first step, therefore, we are faced with determining if the relevant part of *International Engineering* has in fact survived *Chrysler* in a form helpful to our analysis in this case.

In *International Engineering* a government contractor (IEC) brought an action to prevent the Air Force from disclosing to third parties data from technical reports related to IEC's work on Loran C/D bomb/missile guidance systems and delivered to the Air Force pursuant to contract. IEC claimed proprietary interest in the data contained in some of the reports and had

gress, or any regulation of any executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

The net result of these two provisions is that the Court of Claims has exclusive jurisdiction over all non-tort claims (including contract claims) for monetary relief in excess of $10,000 against the United States. It may not, as to any of these or other claims over which it has jurisdiction, grant declaratory or injunctive relief. *See United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

14. Mem. op. at 7.

15. The court's principal distinction between the facts in *Chrysler* and the circumstances of *Megapulse* was that *Chrysler* "dealt with the disclosure of information submitted by a government contractor pursuant to various regulatory requirements, not disclosure of information

submitted in order to perform a contract." *Id.* at 6. By the court's analysis, *Chrysler* was not dispositive of the jurisdictional issue presented in *Megapulse* because it was not a contract-related case and because it did not address the effects of the Tucker Act.

16. 512 F.2d 573 (D.C.Cir.1975), *cert. denied, International Eng'g Co., Div. of A–T–O, Inc. v. Rumsfeld*, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976) (hereinafter *International Engineering*).

17. Mem. op. at 5.

18. As stated on one occasion, the United States, as sovereign, "is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941).

marked affected material with a notice of "limited rights," restricting the Air Force's distribution rights in the data. IEC argued that the unit upon which the reports were based had been developed and built solely at contractor expense and had "been made available for this effort on a no charge loan basis." The Air Force questioned the propriety of the restrictive legend and the contracting officer notified IEC of the Air Force's intentions to utilize the data with unlimited rights.[19]

In its suit of 10 May 1973 for declaratory and injunctive relief, IEC sought judicial review of the contracting officer's decision to strike the proprietary notice, characterizing it as agency action reviewable under Section 10 of the Administrative Procedure Act (APA).[20]

The district court determined that it had jurisdiction in the matter [21] and ultimately entered a preliminary injunction.[22] This court reversed on appeal and remanded the case with instructions to vacate the injunction and dismiss the case for lack of subject matter jurisdiction.[23] The holding that the district court had no jurisdiction to grant the relief sought was based upon the conclusions of three "converging avenues of analysis": (1) the gravamen of IEC's complaint was for breach of contract; the matter was thus within the jurisdiction of the Court of Claims which could grant no in-

junctive relief; [24] (2) the decision by the agency officer to strike the limited rights designation did not constitute "agency action" reviewable under the APA; [25] (3) monetary damages were sufficient relief in this case, and since the APA itself states that judicial review under the APA is inappropriate where there exists "other adequate remedy in a court," there was no need to grant APA review.[26] We are convinced that *Chrysler* effectively counters that portion of the *International Engineering* opinion which found no district court jurisdiction to review the agency's disclosure decision under the APA (avenue 2), and impacts significantly upon the other two "avenues."

In *Chrysler* a government contractor plaintiff sought to enjoin government disclosure of certain data supplied pursuant to regulation to the Defense Department's Defense Logistics Agency.[27] After rejecting propositions that Chrysler had a cause of action under the Freedom of Information Act [28] or an implied right of action under the Trade Secrets Act,[29] the Supreme Court held that a decision to disclose *is* an "agency action" under Section 10 of the APA and that a disclosure which would arguably violate the Trade Secrets Act is reviewable as an action "not authorized by law." A private cause of action thus exists, under the

**19.** This notice was based on IEC's failure to substantiate, to the Air Force's satisfaction, the limited rights claims made.

**20.** 5 U.S.C. § 702 (1976).

**21.** *International Engineering Co. v. Richardson*, 361 F.Supp. 818 (D.D.C.1973).

**22.** *International Engineering Co. v. Richardson*, 367 F.Supp. 640 (D.D.C.1973).

**23.** *International Engineering*, 512 F.2d at 581.

**24.** *Id.* at 578.

**25.** *Id.* at 580.

**26.** *Id.*, citing 5 U.S.C. § 704 (1970).

**27.** As a party to numerous government contracts, Chrysler was required to comply with Executive Orders 11246 and 11375 (charging the Secretary of Labor with ensuring that government contractors provide equal employment opportunities). Department of Labor regulations require government contractors to furnish reports about their affirmative action programs and the general composition of their work forces. The Defense Logistics Agency received these reports as the Defense Department's compliance agency responsible for monitoring Chrysler's employment practices.

**28.** The Court held that FOIA was a disclosure statute by nature, and refused to find a basis in the Act for an antidisclosure (or "reverse FOIA") action by a supplier of information. *Chrysler*, 441 U.S. at 294, 99 S.Ct. at 1713.

**29.** The Trade Secrets Act is a criminal statute describing sanctions for violators but implying no private right of action. *Id.* at 317, 99 S.Ct. at 1725.

APA, for the supplier of data—a person "adversely affected or aggrieved." [30]

The Government would have us distinguish *Chrysler* from both *International Engineering* and this case, arguing that

> agency action exists in the *Chrysler* situation because the rights with regard to the information is [sic] defined by statute in the FOIA and the Trade Secrets Act. In contrast, information submitted pursuant to a contract [as in the instant case] is releasable according to the terms of that contract; not the terms of a statute. [31]

We understand the distinction the Government is trying to make but we find no merit in it. First of all, the distinction presumes a fact as yet unestablished on the merits—that the information which Megapulse is trying to protect actually falls within the scope of the contract. Appellant claims that the information involved "was not developed under the contract at all . . . [but] was submitted to the Coast Guard only to comply with performance requirements for non-commercial application and thus was not governed by the contract at all." [32] We are disinclined to accept the Government's prejudgment of the ultimate (and as yet untried) merits of the action as a basis for a jurisdictional ruling at this stage.

■ Secondly, the Government's suggestion that "agency action" may be involved when an agency official decides to disclose information provided by a government contractor pursuant to *regulation*, but that no "agency action" exists when data subject to the disclosure were supplied to the agency pursuant to *contract*, is unacceptable. In this case, as in *Chrysler*, the "agency action" exists in the official decision to disclose "protected" data. In both cases the supplier of the information claims that insofar as disclosure would violate the Trade Secrets Act the agency was "not authorized by law" under the APA. *Chrysler* was clear in holding that the Trade Secrets Act was applicable to agency disclosure and that the data supplier alleging violation of that Act was an "aggrieved party" with a cause of action under the APA. [33] To the extent that this court's position in *International Engineering* was based on a conclusion to the contrary, it is therefore limited by *Chrysler*.

### B. Limitations on Jurisdiction

While we recognize that *Chrysler* opened an avenue for private causes of action under the APA which this court considered closed at the time of *International Engineering*, we disagree with appellant's argument that *Chrysler* alone is dispositive of the matter at hand. It simply did not address all necessary issues. The Supreme Court identified a technical basis for injunctive relief against agency violation of the Trade Secrets Act, but it was not necessary under the facts in *Chrysler* to consider the possible conflict between jurisdiction over APA-based claims and the restricted role of the federal courts in contract actions under

---

**30.** *Id.* at 318, 99 S.Ct. at 1725. Even though the APA itself technically grants no jurisdiction, power to review any agency action under the APA exists under 28 U.S.C. § 1331. *See Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

**31.** Brief for Appellees at 21.

**32.** Brief for Appellant at 3. Appellant contends that it "filed the present action to enjoin the Coast Guard from issuing the solicitation without safeguard for Megapulse's commercial interests in those trade secrets which *preexisted* its contractual relationship with the Coast Guard and which are included in the data package." *Id.* at 13 (emphasis added). It points out that "[i]t is only this basic technology [of the pulsing circuitry of the megatron and the proc-

ess of its manufacture] which Megapulse seeks to protect in this action, . . . although Megapulse also claims ownership rights in technology and data developed in the course of and as a result of its contracts with the Coast Guard." Affidavit of Paul R. Johannessen, ¶ 10, J.A. at 160–61.

**33.** *Chrysler,* 441 U.S. at 318, 99 S.Ct. at 1725. *Chrysler* clearly states that "any disclosure that violates § 1905 [Trade Secrets Act] is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)." *Id.* It is within the context of whether § 1905 has been violated and not in whether the district court has jurisdiction to decide this issue that the Government's contract arguments are relevant.

the Tucker Act. By contrast, because these Tucker Act-related concerns dominated *International Engineering*, they are central to our discussion of the present case.

It is apparent from a careful reading of *International Engineering* that the "avenues of analysis" described in that opinion converge at a single point of concern—that to allow suit against the United States under the APA in actions actually based on contract would create such inroads into the restrictions of the Tucker Act that it would ultimately result in the demise of the Court of Claims.[34] The fear finds root in the perceived conflict between the APA's broad waiver of sovereign immunity and the limited waiver afforded by the Tucker Act in actions based on government contracts.[35]

■ As indicated in *International Engineering*, the Tucker Act may be read to include more than a jurisdictional scheme. For contract actions at least, the Act also grants a limited waiver of sovereign immunity, allowing suit but limiting the Court of Claims to monetary relief only. The Court of Claims "may neither grant declaratory . . . nor injunctive relief."[36] We continue to believe that this is a fair reading of the Act, and we agree that a plaintiff whose claims against the United States are essentially contractual should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a

district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA.

This concern for preserving the integrity of the Tucker Act is not unique to this court or to contract actions in particular. Courts have not hesitated to look beyond the pleadings of a case brought in district court to determine if it involves a claim over which the Court of Claims has exclusive jurisdiction.[37] Thus, in *Graham v. Henegar*[38] the Fifth Circuit observed,

Because adjudication in a federal district court of a lawsuit that falls within the exclusive jurisdiction of the Court of Claims would seriously undermine the purposes of the Tucker Act, courts confronting the issue have consistently held that the Court of Claims is the sole forum for the adjudication of such a claim, even though the claim would otherwise fall within the coverage of some other statute conferring jurisdiction on the district court.[39]

■ We reemphasize the position of this court, stated in *International Engineering*, that an action against the United States which is at its essence a contract claim lies within the Tucker Act and that a district court has no power to grant injunctive relief in such a case. We disagree, however, with the district court's reading of *International Engineering* to suggest that *any* case

---

**34.** As the opinion observed, adopting language from the Fifth Circuit's *Warner v. Cox*, 487 F.2d 1301, 1306 (1974),

"[I]t is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA. Little imagination is needed to foresee the consequences of a holding that such claims as this may be reviewed either in a court having power to grant equitable relief against the United States or in one having none. We refuse to believe that Congress intended, in enacting the APA, so to destroy the Court of Claims by implication."

*International Engineering*, 512 F.2d at 580.

**35.** The court identified the "real issues" in *International Engineering* as "sovereign immunity and the extent of its waiver for contract actions." 512 F.2d at 580 n.9.

**36.** *Id.* at 577.

**37.** *E.g., Kester v. Campbell*, 652 F.2d 13 (9th Cir. 1981) (court will not construe plaintiff's request as one for injunctive relief when the relief sought is substantively equivalent to a request for a monetary award). *See Laguna Hermosa Corp. v. Martin*, 643 F.2d 1376, 1379 (9th Cir. 1981) (jurisdiction is not determined by relief pleaded but by the real effort of the complaining party).

**38.** 640 F.2d 732 (5th Cir. 1981).

**39.** *Id.* at 734 (citing cases). *See Lee v. Blumenthal*, 588 F.2d 1281 (9th Cir. 1979) (Tucker Act precludes APA and § 1331 district court jurisdiction over non-tort claims against the United States exceeding $10,000); *American Science & Eng'g, Inc. v. Califano*, 571 F.2d 58 (1st Cir. 1978).

requiring *some* reference to or incorporation of a contract is necessarily *on the contract* and therefore directly within the Tucker Act. We do not believe that such a broad test was intended in *International Engineering*, and we refuse to adopt it here.

█ The classification of a particular action as one which is or is not "at its essence" a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate). Where there is only one possible basis for jurisdiction, as was assumed in *International Engineering*, the classification need not be a narrow one. But where there is a possible alternative basis for jurisdiction independent of the Tucker Act, such as is arguably the case before us, we must be more deliberate in our examination. Although it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions, we must not do so in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government. The broad language of *International Engineering*, while appropriate there, is little help to our present analysis, which turns now to a closer look at the "competing" bases of jurisdiction in this case and to determine if the claim so clearly presents a disguised contract action that jurisdiction over the matter is properly limited to the Court of Claims.

1. *Proprietary right vs. contract right*

Contract issues may arise in various types of cases where the action itself is not founded on a contract. A license, for example,

may be raised as a defense in an action for trespass, or a purchase contract may be raised to counter an action for conversion. But the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action based on trespass or conversion into one on the contract and deprive the court of jurisdiction it might otherwise have. As this court observed in *de Magno v. United States*,[40]

It is not at all unusual for a court to find it necessary in the course of deciding a dispute over which it does have jurisdiction to decide an issue which would be outside its jurisdiction if raised directly. For example, in deciding a conversion action, a court may have to determine title to property in another state, a question which it would have no competence to decide directly. Or in a contract action in state court, the court may find it necessary to decide the merits of the defendant's position that the contract was in violation of the federal antitrust laws, an issue which is within the exclusive jurisdiction of the federal courts if raised directly. While a court's lack of jurisdiction to decide an issue *directly* may affect the collateral estoppel effect of the particular factual determination, ... *it does not limit the court's power to decide the question to the extent it is relevant to the dispute over which it does have jurisdiction.*[41]

Even though the Court of Claims is accepted as having exclusive jurisdiction over all contract disputes over $10,000, it certainly has no corner on the power to consider contract-related issues arising in other actions.[42] The Supreme Court many years ago recognized a private party's cause of

---

**40.** 636 F.2d 714 (D.C.Cir.1980).

**41.** *Id.* at 724 (citation omitted) (emphasis added).

**42.** *See Aleutco Corp. v. United States*, 244 F.2d 674 (3d Cir. 1957). In *Aleutco* a purchaser of surplus government materials brought suit for conversion when the Navy refused to release the goods. Because an essential element of conversion is ownership, and because the plain-

tiff showed ownership by way of a sales contract, the cause of action had a technical basis in contract. However, as the Third Circuit noted, conversion is a classic case in tort, and to deny jurisdiction in the district court merely because one element of the case is founded on a contractual relationship would not further the necessary distinction between cases to be brought in the Court of Claims and those to be brought in the district court. *See id.* at 679.

action outside the Tucker Act to challenge the statutory authority of federal officials to claim ownership rights in property allegedly transferred during the course of a contract. In *Land v. Dollar*[43] stockholders in a private company transferred shares of corporate stock to the Federal Maritime Commission in exchange for a release by the Commission from certain obligations, the grant of an operating subsidy, and the extension of a loan. Following repayment of the loan, a dispute ensued as to whether the stock had been sold to the Commission or merely pledged. The shareholders sued in the District Court for the District of Columbia for recovery of the stock. The Supreme Court affirmed this court's ruling that the District Court had jurisdiction to consider the claim since a determination that the suit involved property of the United States, as to which sovereign immunity existed, prejudged the ultimate merits of the action.[44] In language of particular relevance here, the Court explained,

> [P]ublic officials may become tort-feasors by exceeding the limits of their authority. And where they unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, [the aggrieved party] is not relegated to the Court of Claims to recover a money judgment.[45]

Subsequent court rulings have made clear that the jurisdictional bar of sovereign immunity in property disputes arising from contractual relationships does not necessarily apply where the government defendants are charged with having acted beyond the scope of their statutory authority.[46]

■ We are convinced that Megapulse's claims against the Government are not "disguised" contract claims. Megapulse has gone to great lengths to demonstrate that it is not relying on the contract at all. It does not claim a breach of contract, it has limited its request for relief to only six documents "reflecting the essence of the proprietary technology developed ... *prior* to the parties' first contract,"[47] it seeks no monetary damages against the United States,[48] and its claim is not properly characterized as one for specific performance.[49] Appellant's position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act. It is actually the Government, and not Megapulse, which is relying on the contract, attempting to show that the Coast Guard lawfully came into possession of the property and is empowered by the contract to put the entrusted information out for commercial use. As indicated above, we do not accept the Government's argument that the mere existence of such contract-related issues must convert this action to one based on the contract. This court retains the power to make rational distinctions between actions sounding genuinely in con-

**43.** 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947).

**44.** *Id.* at 735–39, 67 S.Ct. at 1010–1013.

**45.** *Id.* at 738, 67 S.Ct. at 1012.

**46.** *See Dugan v. Rank,* 372 U.S. 609, 621, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949); *United States v. Pennsylvania,* 394 F.Supp. 261, 266 (M.D.Penn.1975).

**47.** Brief for Appellant at 30 (emphasis added). The district court confirmed this distinction:
> Plaintiff admits that rights to data and technology developed during the time it was in a contractual relationship with the Coast Guard are governed by the limited rights provisions of the various contracts. Plaintiff acknowledges that this court lacks jurisdic-

tion over such contract questions, which must be litigated in the Court of Claims.... Therefore, *plaintiff seeks by this action to invoke this court's equitable power to issue a preliminary injunction preventing unrestricted disclosure only with regard to the basic megatron data which preexisted the contracts.* As such, it styles this case as a tort claim for misappropriation of rights which preexisted any contracts.

Mem. op. at 4 (emphasis added).

**48.** Monetary damages are sought against defendants Roland and Blum in their *individual* capacities and only as an alternative to the declaratory and injunctive relief sought principally. Complaint, J.A. at 14.

**49.** *See infra* at 970–971.

tract and those based on truly independent legal grounds. This is not a case "falling squarely under the Tucker Act,"[50] as the district court assumed.

### 2. Adequacy of a legal remedy

■ The Government argues that, even if the district court may technically have jurisdiction under § 1331 because of the federal questions involved in determining whether the Coast Guard's actions violate the Trade Secrets Act, the APA itself, in § 704, states that judicial review is inappropriate where there exists some "other adequate remedy in a court."[51] The Government then turns to *International Engineering* to support its contention that the availability of money damages in the Court of Claims in this type of action is an "adequate remedy." We do not read from the APA the *per se* rule the Government seems to suggest. The question of adequacy may be resolved only against the facts of each case. While we acknowledge the court's conclusion in *International Engineering* that monetary relief was possible and adequate in that case, we do not believe that a similar conclusion is required here.

The technical data which Megapulse seeks to protect in this case relate to the "detailed manufacturing processes and techniques followed in constructing the megatron, [which] could not be built without knowing these methods."[52] Unlike the data in *International Engineering*, which the Government characterized as "useless except for what not to do,"[53] the megatron is allegedly a valuable and working circuit system of enormous commercial value to Megapulse and of particular usefulness in the private sector when utilized at lower power ranges.[54] As appellant maintains, "[T]he trade secrets here at issue represent the very economic life blood of Megapulse."[55] Assuming an adequate preliminary support of these allegations,[56] there is no basis in the Government's reliance on APA § 704 as denying jurisdiction to the district court to grant preliminary relief and to make an ultimate determination on the merits.[57]

■ Finally, the Government argues that the relief sought by Megapulse is tantamount to a request for specific performance of a government contract and that such relief may not be granted under the APA. First, it posits that the Tucker Act implicitly forbids specific performance by granting no equitable jurisdiction to the Court of Claims. It then points to language in § 702 stating that nothing in the section entitling parties to judicial review of agency action and waiving sovereign immunity

(1) affects other limitations on judicial review or the power or duty of the court

---

50. Mem. op. at 8.

51. Brief for Appellees at 24.

52. Brief for Appellant at 10–11.

53. *International Engineering*, 512 F.2d at 580. The court in *International Engineering* also observed that the Government, as the only market for a Loran system, could also remedy any wrongful disclosure by cancelling procurements to competitors who wrongfully acquired the information, making IEC the sole supplier. *Id.* at 581 n.11. Megapulse, on the other hand, is not concerned with use by competition in government procurement, but with unlicensed commercial use in the private sector.

54. Brief for Appellant at 11.

55. Affidavit of Paul R. Johannessen, J.A. at 161, ¶ 13; *See* Affidavit of Stephen C. Bigelow, J.A. at 188–89, ¶ 20.

56. As part of the four-part test used to consider requests for preliminary injunctions, the plaintiff must show a likelihood of ultimate success on the merits, or at least make out a substantial case. *See Washington Metro. Area Transit Auth. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *Virginia Petroleum Jobbers Assoc. v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958).

57. In essence we read nothing more into the relevant portion of § 704 than an incorporation of the general rule that the adequacy of alternative legal remedies is key to the consideration of all claims for equitable or injunctive relief. The waiver of sovereign immunity for APA review under § 702 applies only to actions "seeking relief other than money damages." Section 704 simply states that APA review (and therefore "relief other than money damages") is appropriate only in actions "for which there is no other adequate remedy in a court."

to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.[58]

It concludes that the district court has no power to grant injunctive relief in this case. We are not willing to follow this line of logic.

It is one thing to rely on the generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract. It is quite another to claim, as the Government does in this case, that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract. Government's counsel admitted at oral argument that by the logical inference of its position the government could avoid injunctions against activities violative of a statutory duty simply by *contracting* not to engage in those activities. Because government involvement in any such activities would thereby also constitute a breach of a contract term, any injunction would be equivalent to an award of specific performance, which, as a matter of public policy, is not available against the government.[59] We cannot accept such an interpretation of the law for many of the same reasons we refuse automatically to classify claims raising contract issues as "contract actions."

■ It is clear to us that so long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a "contract action" for Tucker Act purposes, its reme-

dies are also not contract-related, and the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate. We find no limits, imposed by sovereign immunity, on the district court's jurisdiction to consider and grant (if appropriate) Megapulse's request for injunctive relief.

## III. CONCLUSION

The district court described as the "key issue" in this case the question of whether it had subject matter jurisdiction over Megapulse's Trade Secrets Act claims. It concluded that it did not and for that reason declined to rule on the merits. We find that the district court erred in this conclusion, based as it was on a determination that appellant's action fell within the Tucker Act. It is clear to us that Megapulse has not brought a contract action or an otherwise disguised claim for monetary relief against the United States. This action was properly brought under the APA, and injunctive relief, preliminary or permanent, is available in the district court.

The summary judgment for the Government is therefore reversed and the case is remanded; the district court is free to proceed on the merits of appellant's claim and to grant such non-monetary relief as it finds appropriate.

*So ordered.*

---

**58.** 5 U.S.C. § 702 (1976).

**59.** Such an approach would, of course, be far from encouraging for people otherwise willing to contract with the government. *Chrysler v. Brown* and other cases involving trade secrets furnished at the compulsion of government regulation rest on the premise that it is the government's best interest to permit parties who consider themselves aggrieved to litigate to prevent government disclosure of trade secrets, because by doing so the government encourages future voluntary compliance with the rele-

vant regulations. It is no different when a contract, rather than regulation, requires the furnishing of information. Only by allowing injunctive relief, when appropriate, will the government encourage entrepreneurs who have a corner on valuable technical data openly to contract with and benefit the government. If a company cannot be assured that it can protect proprietary data after furnishing it pursuant to contract, there will be few eager to enter those contracts.