United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 10, 1998 Decided June 23, 1998

 No. 97-5129

 Mutual of Omaha Insurance Company and 

 Union Labor Life Insurance Company, 

 Appellees

 v.

 National Association of Government Employees, Inc., et al., 

 Appellants

 Office of Personnel Management and 

 Constance J. Horner, in her official capacity as 

 Director of OPM, 

 Appellees

 Appeal from the United States District Court 

 for the District of Columbia 

 (88cv0516)

 Denis F. Gordon argued the cause for appellants with 
whom Brad W. Spencer was on the briefs. James R. Barnett 
entered an appearance.

 Dara A. Corrigan, Assistant United States Attorney, ar-
gued the cause for appellees Office of Personal Management 
and Constance J. Horner, with whom Wilma A. Lewis, Unit-
ed States Attorney, and R. Craig Lawrence, Assistant United 
States Attorney, were on the brief. John D. Bates, Assistant 
United States Attorney, entered an appearance.

 William O. Bittman argued the cause for appellees Mutual 
of Omaha Insurance Company and Union Labor Life Insur-
ance Company, with whom Michael Barrett was on the brief. 
James S. Ray entered an appearance.

 Before: Silberman, Henderson, and Rogers, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: The National Association of 
Government Employees (the Union or NAGE) appeals from a 
district court order "extinguishing" its claim for money con-
tained in a contingency reserve fund maintained by the Office 
of Personnel Management (the Office or OPM). The district 
court lacked jurisdiction to make this determination--and 
may well have lacked jurisdiction over the whole case--thus 
we vacate its order.

 I.

 The Federal Employee Health Benefits Act establishes a 
subsidized health insurance program for civilian employees 
and annuitants of the federal government. Carriers contract 
with OPM, the agency that oversees the program, to provide 
health insurance to those who choose to enroll. As an 
"employee organization," the Union qualified as a "carrier" 
under the statute, 5 U.S.C. s 8903(3) (1994), and it contracted 
with the Office to sponsor a health insurance program for its 
members. That contract subjected all disputes arising under 
it to the jurisdictional limitations of the Contract Disputes 


Act. By subcontract, Mutual of Omaha Insurance Company 
(Mutual) and Union Labor Life Insurance Company (Union 
Labor or ULLICO) underwrote the plan during successive 
periods. The Office maintains a "contingency reserve fund" 
comprised of three percent of the plan's total contributions 
for each plan established under the Act. When a plan's costs 
exceed its annual income, the carrier may apply for a special 
transfer from this surplus account. 5 C.F.R. s 890.503(c)(5) 
(1998).1

 After suffering approximately $17.5 million in losses during 
its underwriting period, Mutual applied to the Office for a 
special transfer from the NAGE plan's contingency reserve 
fund. The Office refused to consider the application, taking 
the position that only the Union, the party with whom it 
contracted, qualified as a "carrier" of the plan. Mutual then 
sued both the Office and the Union, but ultimately dropped 
its claims against the Union in a 1990 settlement agreement. 
Union Labor, afraid that Mutual's claims would deplete the 
contingency reserve, intervened as a plaintiff in the lawsuit to 
recover losses it had incurred underwriting the NAGE plan.

 Two days before trial, the parties settled. They recorded 
the agreement in front of the district court on August 9, 1995:

 Mr. Kozma (Counsel for ULLICO): [W]e all understand 
 that Mr. Haynes [Assistant U.S. Attorney] has to get his 
 approvals and all of that, but with everybody's concur-
 rence, I will go ahead and state the settlement as I 
 understand it.

 O.P.M. has agreed to pay out $17,450,000 out of the 
 contingency reserve fund. Of that amount, four-million 
 will go to Mutual of Omaha. The balance will come to 
 Union Labor Life Insurance Company.

 We have agreed that the payment should be within 
 forty-five days. That is subject to O.P.M. using--O.P.M. 
 and the U.S. Attorney using their best efforts to obtain 

__________
 1 At the time this lawsuit was filed, this regulation was codified 
at 5 C.F.R. s 890.503(c)(6).

 approval and arrange for the payment within that time 
 period.

 We would like to see the money as soon as possible, 
 obviously.

 All claims against all parties will be dismissed. No 
 party receives any fees or costs. Each party bears their 
 own fees and costs.

 And that's pretty much my understanding.

 Mr. Spencer: Your Honor, Brad Spencer for NAGE.

 That will include the claims against NAGE which we 
 bifurcated for a separate trial. 

 The Court: I understand.

 Mr. Spencer: This will wipe this case off the docket.

 The Court: All right.
 Mr. Kozma: That's correct.
 Mr. Haynes: Your Honor, Fred Haynes for the govern-
 ment.
 The only disagreement I have with what Mr. Kozma 
 said is that we agreed to pay--and obviously, I would 
 prefer we not get into this, but since your honor has said 
 we should, I am doing it.
 We have agreed to pay 2.2 to Mutual--million--and 
 the remainder to ULLICO.
 Now, they have requested that we try to arrange [sic] 
 four-million direct payment to Mutual. We're going to 
 look into that, but it has to be with the understanding 
 that only 2.2 million is going from us to Mutual.
 I won't bore you with the reason why this is signifi-
 cant, but it is significant to us. And we agreed to 2.2 
 million to Mutual and the remainder to ULLICO.
Mr. Kozma: We don't dispute that, your Honor.
 The Court: And were no more than 2.2 million to go 
 from O.P.M. to Mutual, then the payment would be made 
 by ULLICO from the sum that it had been given. 
 Mr. Kozma: We will make some arrangements to get
 the money--

 The Court: To Mutual?

 Mr. Kozma: Yes.

 And I would also like to say that I have already begun 
 drafting a settlement agreement, which I will circulate. 
 It's the parties' intention to reduce all of this to a 
 settlement agreement that will be executed.

Because the contingency reserve fund had grown through 
interest accruals, the parties were aware that the payments 
to Mutual and Union Labor would not completely empty it.

 On August 11, 1995, Kozma circulated a draft agreement to 
all of the parties. That afternoon, counsel for the Union 
called Kozma and objected to the language in paragraphs 4 
and 14 of the draft.2 Paragraph 4 said: "The NAGE defen-
dants shall receive none of these funds," and paragraph 14 
said:
 This Agreement constitutes a full and complete release 
 by each of the parties in favor of each of the other 
 parties of all claims or liabilities that were or could have 
 been asserted in this action, and of all claims and liabili-
 ties arising from or out of the NAGE plan, its operation 
 and administration from 1985 to the present, except as 
 set forth in this Agreement.
The Union's counsel thought this language was overbroad and 
could be read to preclude the Union from seeking reimburse-
ment from the Office for an unrelated claim dealing with 
expenses it incurred paying the final claims made after the 
plan closed. He suggested changes that would clarify that 
nothing in the settlement barred the Union from making such 
a claim in the future.

__________
 2 In its brief, the government disingenuously suggests that the 
Union did not object to the language in the settlement agreement 
until after October 12, 1995. To support this contention, the 
government compares an affidavit from the Union's counsel, which 
recounts the August 11 phone call, with one from Kozma making no 
reference to it. The government unforgivably omits reference to 
Kozma's second clarifying affidavit, in which he admits that this 
phone call did occur.

 Kozma, however, never communicated the Union's concerns 
to the other parties. On September 20, 1995, Kozma, joined 
by counsel for Mutual, wrote to the Deputy Attorney General 
of the United States seeking to expedite the government's 
approval of the settlement. Despite the Union's objections, 
this letter stated that "by August 18, all parties had approved 
the [August 11] draft except DOJ." To make matters worse, 
in what Kozma later described as an "oversight," the letter 
was sent to everyone involved in the suit except the Union. 
Kozma said that he just hadn't thought that the Union's 
concern was material. To be sure, the Union had no claims in 
the suit and was not paying anyone else's claims. Indeed, it 
was asked to leave the room for substantial periods during 
the settlement negotiations so that counsel for all parties 
other than the Union could conduct private discussions.

 On October 10, all parties appeared before the district 
court, and Assistant U.S. Attorney Haynes announced that he 
expected final Justice Department approval by the end of the 
day. Two days later, when Kozma circulated a second draft, 
the Union realized that its comments had been ignored. The 
Union's lawyer immediately called Kozma, who told him to 
take up his problems directly with the government.

 Accordingly, on October 17, the Union submitted a close-
out accounting statement to the Office requesting approxi-
mately $600,000 from the contingency reserve fund as reim-
bursement for expenses incurred during the claims run-off 
period. Immediately, a furor erupted. In court that morn-
ing, Haynes said that the government had entered into the 
agreement with the understanding that it could use the 
remaining reserve money for other plans under the Health 
Benefits Act. Counsel for the Union asserted that, as a 
defendant in the suit, it did not have a claim subject to the 
settlement and did not perceive the agreement to waive any 
of its potential claims. The district court gave the parties a 
week to sort out the conflict.


 All counsel drafted affidavits setting forth their recollection 
of the settlement negotiations. According to Kozma, OPM 
officials had expressed concern early in the negotiations that 
no close-out accounting statement had been submitted for the 
NAGE plan. Yet though the statement--and any accompa-
nying request for reimbursement--remained outstanding, the 
government made no attempt to secure a waiver from the 
Union. Haynes admitted that he did not "specifically recall" 
the Union agreeing to a waiver. He nevertheless insisted 
that the Office had perceived itself to be entering a "global 
settlement." The government's self-serving perception ap-
pears to be based more on wish fulfillment (and fear of 
embarrassment) than on hard facts. As Kozma explained, 
"The settlement discussions concerned only the claims made 
in this action. At no time did the NAGE defendants mention 
any new claim against the contingency reserve. Conversely, 
at no time did the OPM defendants request a release from 
any party going beyond the claims made in this action." 
Similarly, counsel for Mutual said, "At all times, the settle-
ment discussions concerned only the resolution of claims that 
had been brought in this lawsuit ... [a]t no time did the 
settlement discussions ever concern the release of claims that 
had not been brought and could not have been brought in this 
lawsuit regarding the NAGE Plan's contingency reserve." 
Counsel for both insurance companies agreed that the Un-
ion's claim could not have been brought in this lawsuit 
because it would have been subject to the Contract Disputes 
Act, which deprives district courts of jurisdiction over certain 
contract claims against the federal government.

 Mutual and Union Labor filed a joint motion to enforce the 
settlement agreement, and the district court ordered the 
Union to show cause why it should not be bound. On 
December 12, 1995, the district court issued an order (drafted 
by Mutual and adopted wholesale) enforcing the settlement 
and "extinguishing" the Union's claims. In this order, the 
court found that the Union's silence regarding its claim 
"estopped" it from asserting that it did not agree to the 
settlement. When it finally ruled on the Union's motion to 
amend the judgment--two years later--the court, clarifying 


its earlier order, said that the language of estoppel did not 
mean that the Union had consented to the contract. The 
following interchange took place between the government's 
counsel and the district court:

 Mr. Haynes: Your Honor, I interpreted your estoppel 
 language as being--as falling in that area of contract law 
 where they say that you can be bound to a contract by 
 silence--by conduct. We certainly argue that they were 
 bound to the settlement.

 The Court: That is an argument for you to make before 
 O.P.M. 

 Mr. Haynes: Well, I can tell you, Your Honor, that 
 O.P.M. is not going to pay their claim, because it's our 
 view that we entered into a global settlement. And I 
 think we went through this. I don't want to go over 
 what we have been through, but we thought we had a 
 global settlement. Now, they are trying to carve out 
 their part of it so that we end up the loser, because we 
 paid out $17,500,000.00 to the plaintiffs on the assump-
 tion that we would get the rest of it. Now they come to 
 us, after the agreement is reached, and say, "No, you 
 don't get that. You have to give us a good part of it."

 So we feel as though there was an agreement. They 
 are bound by their silence--by their conduct, and that 
 Your Honor correctly extinguished their claims, but on 
 the basis that they were part of the contract.

 Thank you, Your Honor.

 The Court: But I did not find that they were a party to 
 the contract. (Emphasis added.)

 II.

 This is an extraordinary case. The government fiercely 
defends the district court's determination that the Union is 
bound to the settlement, but does not produce any evidence 
or real legal theory to support its claims. Although the 
government reiterates the "view" of its counsel below that it 

entered into a "global settlement," which presumably picked 
up the Union through its gravitational pull, we gained the 
impression that the government believes the Union is also 
guilty of l%22ese majest%21e because the government's lawyers were 
not told of the Union's objections until after the Assistant 
United States Attorney had received the Deputy Attorney 
General's blessing of the settlement. Consistent with its 
global settlement claim, the government contends that there 
can be no agreement between it and the insurance companies 
if the Union prevails. The insurance companies, for their 
part, treat the Union like the proverbial skunk at the garden 
party, but insist that whatever happens to the Union, the 
government is bound.

 Recognizing that the district judge did not find it a party to 
the settlement agreement (and discounting the estoppel no-
tion as without legal support), the Union reasons that the 
district court's determination must have been a ruling on the 
merits of its claim against the contingency reserve. It argues 
that the district court lacked subject matter jurisdiction to 
make that determination because the Union's claim is covered 
by the Contract Disputes Act. The government does not 
dispute that the Contract Disputes Act, see 41 U.S.C. s 602(a) 
(1994), would apply to any claim arising under the NAGE 
policy. Such claims can only be resolved by the "contracting 
officer," id. s 605(a) (1994), and appealed to either an agency 
board of contract appeals or the United States Court of 
Federal Claims. Id. s 606 (1994); s 609 (1994).

 The Union's jurisdictional argument raised for us the ques-
tion whether the district court lacked jurisdiction over the 
entire case. If the insurance companies' claims are predicat-
ed on the Union's policy, they too might be covered by the 
Contract Disputes Act. We asked the parties to address this 
issue at oral argument (but had little success), and Mutual 
submitted a supplementary brief which has left us even more 
uncertain as to whether the district court had jurisdiction 
over the insurance companies' complaints. Without it, the 
court may not have had authority to enter an order enforcing 
the settlement agreement. In Kokkonen v. Guardian Life 


Insurance Co. of America, 511 U.S. 375 (1994), the Supreme 
Court held that a district court had no power to enforce a 
settlement agreement after it had completely dismissed the 
underlying suit. That case at least implies that district courts 
cannot enforce settlement agreements without some basis for 
jurisdiction of the underlying suit--which is merely a specific 
application of the long-standing rule that "[w]ithout jurisdic-
tion the court cannot proceed at all in any cause." Ex parte 
McCardle, 74 U.S. (7 Wall.) 506, 514 (1869). See also Steel 
Co. v. Citizens for a Better Env., 118 S. Ct. 1003, 1016 (1998) 
("Hypothetical jurisdiction produces nothing more than a 
hypothetical judgment--which comes to the same thing as an 
advisory opinion....")

 In its supplemental brief, Mutual argued in a conclusory 
fashion that both of the insurance companies' complaints are 
really administrative challenges to the Office's interpretation 
of its own rules and the Health Benefits Act. But this 
characterization is not determinative, for "a plaintiff may not 
avoid the jurisdictional bar of the [Contract Disputes Act] 
merely by alleging violations of regulatory or statutory provi-
sions rather than breach of contract." Ingersoll-Rand Co. v. 
United States, 780 F.2d 74, 77 (D.C. Cir. 1985). Nor would 
the Health Benefits Act confer jurisdiction on the court if the 
complaints indeed turn on contract. A section of that Act 
does provide that "[t]he district courts of the United States 
have original jurisdiction, concurrent with the United States 
Court of Federal Claims, of a civil action or claim against the 
United States founded on this chapter." 5 U.S.C. s 8912 
(1994) (emphasis added). But an action founded on contract 
is not "founded on this chapter." Cf. 28 U.S.C. s 1346(a)(2) 
(1994) (depriving district courts of jurisdiction over claims 
against the United States "founded upon any express or 
implied contract" with the United States that is subject to 
the Contract Disputes Act) (emphasis added). What matters 
is the source of the right at stake. As we said in Ingersoll-
Rand, "determining whether an action is founded upon a 
contract ... 'depends both on the source of the rights upon 
which the plaintiff bases its claims, and upon the type of relief 


sought (or appropriate).' " 780 F.2d at 76 (quoting Mega-
pulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982)).

 We think the best course, given our uncertainty as to the 
nature of the insurance companies' original claims, is to 
remand the case to the district court so that it can make an 
explicit determination as to its jurisdiction over the insurance 
companies' suits against the government. (It is of course 
possible that even if the district court lacked jurisdiction the 
settlement agreement would be enforceable in some tribunal.) 
But we think the Union is entitled to escape this mess. The 
district court expressly found that it was not a party to the 
settlement, and we cannot imagine how the Union could be 
otherwise "estopped" from pursuing its claim (nor, for that 
matter, how it could even be criticized for its behavior). We 
thus agree with the Union that the district court's order 
should be construed as reaching the merits of its claim 
against OPM--which it clearly lacked jurisdiction to do. Ac-
cordingly, we direct that the district court's order be vacated 
and the case remanded to determine whether the settlement 
can be enforced as to the parties other than the Union.

 So ordered.