**Robert ROBBINS, et al., Plaintiffs,**

v.

**Ronald REAGAN, et al., Defendants.**

**Civ. A. No. 85–1963.**

United States District Court, District of Columbia.

Aug. 19, 1985.

---

S. William Livingston, Jr., Peter J. Nickles, Laird Hart, and Charles G. Geyh of Covington & Burling, Florence Wagman Roisman of Roisman, Reno & Cavanaugh, Washington, D.C., for plaintiffs (Frank Molony and Suzanne Hutchings, Law Student Interns, on brief).

Edith S. Marshall, Asst. U.S. Atty. (Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, Asst. U.S. Atty., and Ellen Dickstein Kominers, Office of Gen. Counsel, U.S. Dept. of Health and Human Services, Washington, D.C., on brief), Mark E. Nagle and John Bates, Asst. U.S. Attys., Darrel J. Grinstead, Office of Gen. Counsel, Dept. of Health and Human Services, Washington, D.C., for defendants.

Michael S. Helfer and Charles E. Davidow of Wilmer, Cutler & Pickering, Washington, D.C., court-appointed, amici curiae until the Court's remand to the agency for a reasoned analysis of its decision.

## TABLE OF CONTENTS

Page

1262 INTRODUCTION

1263 BACKGROUND

1263 A. The Parties.

1263 B. The Government's Involvement with the Problems of the Homeless, and with the Shelter.

1265 C. Events After the Heckler Statement.

1267 D. The Remand to HHS for Subsequent Proceedings, and the Agency's Final Decision.

1268 E. The Amended Complaint.

1268 THE COURT DISMISSES COUNTS FOUR, FIVE, AND SIX BECAUSE THEY FAIL TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED

**1262**

1269 BECAUSE PLAINTIFFS HAD AN OPPORTUNITY TO COMMENT ON THE PROPOSED SHELTER CLOSING, THEY HAVE NOT BEEN DEPRIVED OF PROPERTY WITHOUT DUE PROCESS OF LAW

1270 BECAUSE THE SHELTER RESIDENTS ARE NOT "TENANTS", THE COURT MUST DISMISS COUNT TEN, WHICH CLAIMS A VIOLATION OF D.C. EVICTION LAW

1271 THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' COUNTS THREE AND EIGHT, WHICH ARE BASED ON CONTRACT, BECAUSE SUCH CLAIMS ARE COMMITTED TO THE EXCLUSIVE JURISDICTION OF THE CLAIMS COURT

1272 THE COURT MUST RULE FOR DEFENDANTS ON PLAINTIFFS' APA CLAIMS BECAUSE DEFENDANTS' DECISION TO CLOSE THE SHELTER AND SPEND $2.7 MILLION TO RELOCATE THE RESIDENTS IS BASED ON A REASONED ANALYSIS

1273 A. This Court Has Jurisdiction Over Plaintiffs' APA Claims.

1274 B. Because There is Ample "Law to Apply" to Defendants' Decision to Close the Shelter, that Decision is Reviewable Under the APA.

1276 C. The Defendants' July 31, 1985, Decision is Based on a Reasoned Analysis, and Must be Sustained.

1279 CONCLUSION

## INTRODUCTION

**CHARLES R. RICHEY, District Judge.**

This case, which is before the Court on defendants' motion to dismiss or, in the alternative, for summary judgment, and on plaintiffs' motion for partial summary judgment, presents the issue of when the government may change its announced course of action based on somewhat changed circumstances. For the reasons stated herein, the Court grants defendants' motion, and enters judgment for defendants in this case.

The case concerns the future of a federally-owned building which is operated by some of the plaintiffs as a shelter for homeless persons. For various reasons, the government has now decided to close this shelter, despite a statement made last November by Secretary Heckler of the Department of Health and Human Services ("HHS") that the government would perform certain renovations on the building. The primary legal battleground for this dispute is found in the Administrative Procedure Act ("APA"), and the cases decided thereunder. As applied to the situation before the Court, that Act provides a narrow standard of judicial review. The government's decision in this case is based on a thoroughly reasoned analysis, and, most importantly, provides for the expenditure of up to $2.7 million to assist in the relocation of the shelter residents. For this reason, it cannot be said that the federal government has callously "turned its back" on the residents. As noted, the Court upholds the decision, which was made on July 31, 1985, after the Court remanded the case to HHS for further proceedings.

Notwithstanding the foregoing, within 30 days *only* the Court will entertain written applications to the Clerk, by way of a pleading, for the appointment of a Special Master for the purpose of ensuring that the federal government assists in locating proper health care and shelter providers and does what it has now promised, (as a result of this lawsuit). In this regard, the Court will use every power which it may have at its disposal in order that the residents of the Second and D Street, N.W., building are provided in other facilities with the resources they need to live as decent human beings so that they may receive treatment for their various prob-

lems, such as alcohol and drug addiction, and other mental health problems. The Court also realizes that these people need food and assistance to care for their nutritional deficiencies.

The Court recognizes that many of these people require counselling, job training, and have a myriad of other needs. Meanwhile, the Court is confident that Mr. Snyder, Ms. Fennelly, and the other leaders of CCVN will cooperate *fully* in this long overdue bold and prompt action to see that the residents of the dilapidated rat and vermin-infested building are transferred to appropriate facilities with dispatch and human kindness.

This effort will require governmental leadership from top to bottom, starting at the White House, in a multitude of disciplines that are involved. But the Court expects that the captains of industry, commerce, banking, hospitals, skilled nursing homes, and other health care providers, and the medical, psychiatric, and legal professions will all be asked and urged in the strongest possible terms to find and implement a *solution* to this disgraceful problem. No more delay can be tolerated in the face of this human misery. Thus, the Court will be watching and waiting to see what the President of the United States and his associates in the government, as well as the leaders of the private sector, do. The Court believes it will be enough, but, if not, the Court stands ready to consider the appointment of a Special Master, who will be a nationally recognized expert in this multi-disciplinary problem.[1] As currently envisioned[2], the Special Master would report on the conduct of those with the resources and expertise to solve and eliminate this problem—not to exacerbate it through press conferences and the hurling of recriminations, all at the expense of the truly needy. Only our nation's conscience and the residents of this building, who might otherwise be on the grates and in the parks of the nation's capital, will be harmed further if a solution is not achieved.

## BACKGROUND

### A. The Parties.

The plaintiffs in this case include several residents of the building located at Second and D Streets, N.W., Washington, D.C., which building is now operated as a shelter for homeless persons; the Community for Creative Non-Violence ("CCNV"), an unincorporated religious association which currently operates the shelter; and Mitch Snyder and Carol Fennelly, two members and representatives of CCNV. The defendants include Ronald Reagan, the President of the United States; Donald Regan, the Chief of the White House Staff; Margaret Heckler, the Secretary of the Department of Health and Human Services ("HHS"); Harvey Vieth, Director of the HHS Office of Community Services and Chairman of the Federal Inter-Agency Task Force on Food and Shelter for the Homeless ("the Task Force"); and Dwight A. Ink, Acting Administrator of the General Services Administration ("GSA"). All of the defendants are sued in their official capacities for declaratory and injunctive relief only.

### B. The Federal Government's Involvement with the Problems of The Homeless, and with the Shelter.

All of the facts material to this case are undisputed. On October 31, 1983, HHS Secretary Heckler established the Federal Inter-Agency Task Force on the Homeless. This Task Force, which includes representatives from thirteen federal departments and agencies, was designed to coordinate federal efforts toward improving the conditions of the nation's homeless persons. As noted, defendant Dr. Harvey Vieth is the Chairman of the Task Force.

---

**1.** Anyone interested in the appointment as a Special Master should not contact the Court directly, but should only notify the Court by filing a pleading, containing the person's name, address, and qualifications, with the Clerk of the Court.

**2.** If the appointment of a Master appears necessary, the Court will seek briefing from the parties concerning the nature and extent of the Court's authority in this regard.

In December, 1983, plaintiff Mitch Snyder wrote to defendant Vieth seeking permission for CCNV to use the vacant GSA-owned building at 425 Second Street, N.W., Washington, D.C., as an emergency shelter for the city's homeless persons. Dr. Vieth and other federal officials were receptive to Snyder's proposal, and, later that month, HHS requested that the building be assigned to that Department, HHS, for use as a shelter for the city's homeless persons. On December 23, 1983, GSA issued a license to HHS for the building to be used for that purpose until March 31, 1984.

On December 27, 1983, HHS issued a license to the District of Columbia ("D.C.") Government for the use of the building as a shelter for the homeless until March 31, 1984. The D.C. Government in turn assigned its license to CCNV to operate the shelter until March 31, 1984.

On January 15, 1984, CCNV opened the building as a shelter for the homeless. CCNV subsequently requested that they be permitted to operate the building as a shelter beyond March 31, 1984. CCNV also provided the federal government with a document prepared by architect Conrad Levenson. Levenson had, at CCNV's request, examined the building and prepared this document, which represented his estimate of the scope and cost of repairs needed to restore the somewhat deteriorated building to a basic operating level. Levenson's estimate of the costs needed for such repairs and renovation was approximately $5 million. In March, 1984, CCNV asked the federal government to perform these repairs and alterations.

Federal officials agreed that CCNV should be allowed to continue to operate the building as a shelter, and, on March 30, 1984, GSA indefinitely extended HHS's permit to use the building. This modification of the permit provided that either party, GSA or HHS, could terminate the agreement on 30 days notice. HHS then offered to extend its license to the D.C. Government, but the District refused to accept the extension. Thus, D.C.'s license to CCNV expired on March 31, 1984. Despite the absence of any license or permit for CCNV to use the building, HHS has allowed the continued operation by CCNV of the building as a shelter for the homeless.

On July 27, 1984, plaintiff Mitch Snyder wrote to President Reagan again requesting that the federal government expend approximately $5 million to renovate the shelter. By letter dated August 14, 1984, Dr. Vieth, as Director of the Task Force, responded to Mr. Snyder's request, suggesting that CCNV's concerns be directed to the District of Columbia Government. Dr. Vieth stated that the Task Force had consistently emphasized that local governments and local providers are responsible for maintenance and support services of the shelters. The federal government's role, Dr. Vieth noted, consisted of responding to local governments and groups concerning the availability of federal buildings and surplus property for homeless people.

On September 15, 1984, Mitch Snyder and other CCNV members began a fast in an effort to secure the renovation of the building by the federal government. HHS representatives subsequently negotiated with Mr. Snyder concerning the possible renovation of the building. On November 3, 1984, the 50th day of the fast, Secretary Heckler spoke to Mr. Snyder on the telephone. On November 3 and 4, 1984, Dr. Vieth and C. Maclain Haddow, Secretary Heckler's Executive Assistant, had several telephone conversations with Mr. Snyder. On November 4, 1984, Haddow and Vieth came to the CCNV house with a document describing the renovations that the federal government agreed it would perform at the building.

The document was a statement by Secretary Heckler, which began with the following language:

> President Reagan has asked me to authorize the renovation of the temporary shelter at Second and D Streets, N.W., to make it into a model physical shelter structure to house the homeless in the District of Columbia.

The statement went on to note the Task Force's fruitless negotiations with the D.C. Government in an effort to find alternative sites for the homeless people to live. Sec-

retary Heckler again noted "that the involvement of local government is essential if local shelter programs are to succeed", and "call[ed] upon Mayor Barry to join in partnership with the Federal Government by providing social services in the District of Columbia shelter to help these fragile citizens of his city." Despite the lack of cooperation from the D.C. Government, Secretary Heckler, noting that the oncoming cold weather necessitated an immediate solution for the homeless in the shelter, included the following in the document:

> The Federal Government will rehabilitate the structure (at Second and D Streets, N.W.), to create a model physical shelter structure to house the homeless in the District of Columbia as long as a critical need exists, with special attention to preserving dignity of the homeless through the following:
>
> 1. Adequate locker facilities for securing personal belongings of those utilizing the shelter.
> 2. Provisions of adequate shelter space for separate men's and women's quarters.
> 3. Adequate kitchen facilities for food preparations.
> 4. Laundry room facility.
> 5. Emergency first aid station.
> 6. Consultation rooms for social service providers.
> 7. Adequate fire prevention sprinkler system.

Haddow, Vieth, and Snyder discussed the document, and eventually believed that they reached an agreement. Secretary Heckler and Mitch Snyder spoke on the telephone, and Snyder then ended his fast.

*C. Events After the Heckler Statement.*

Prior to and after Mr. Snyder ended his fast, federal officials discussed the proposed renovation of the building with CCNV representatives. Plaintiffs contend that the federal officials agreed to construct single-person cubicles in the building. Defendants deny that they ever agreed to this. Plaintiffs also contend that federal officials agreed that architect Conrad Levenson would perform the design

work for the shelter. The federal officials also deny this agreement. As shall become clear, these disputes are not material to the resolution of the motions before the Court.

After agreeing to perform at least the seven items listed in the November 4, 1984, document, HHS proceeded to identify funds to be used to undertake the renovations. The government determined that funds were available in the Congressional appropriation for the discretionary program under the Community Services Block Grant program. Congress had appropriated approximately $30 million for the entire program, which funds were to be used nationwide for a variety of purposes. *See* 42 U.S.C. §§ 9901 and 9910; Pub.L. No. 98–619, 98 Stat. 3305, 3319 (1984). Of this $30 million, only $19,920,000 is designated for programs instituted under the section of the Act which is pertinent here, 42 U.S.C. § 9910(a)(2)(A). *See* 98 Stat. at 3319.

On December 27, 1984, Dr. Vieth wrote a letter to the National Endowment for the Arts supporting a grant application presented by the National Coalition for the Homeless on behalf of CCNV. This letter, which had been requested by the architect retained by CCNV, Conrad Levenson, stated that the grant funds would enable CCNV to develop renovation plans for the shelter.

On February 8, 1985, CCNV provided to HHS a copy of Levenson's renovation plans, which had been publicly displayed on January 31, 1984. Levenson's plans provided for extensive renovations, including the construction of individual cubicles for the shelter residents. In early March, 1985, GSA and Task Force officials met with CCNV and architect Levenson, and two of his associates, to discuss the renovation plans. These groups engaged in several communications over the next two weeks. It soon became clear that the Government was willing to complete fewer renovations than was acceptable to CCNV. On March 18, 1985, GSA determined that Levenson's plans for renovation of the shelter would cost over $10 million, which was considerably more than the federal govern-

ment was willing to commit, particularly because it represented over fifty per cent of the total appropriations for such programs nationwide. GSA also determined that the cost of renovating the building in accordance with Secretary Heckler's seven-point statement would be approximately $1.55 million if the building was to be retained for one to three years, and $2.7 million if the building was to be retained for three to five years. By letter dated March 21, 1985, GSA communicated these estimates to Dr. Vieth. On May 30, 1985, the expenditure of $2.7 million was formally authorized for building repairs and improvements.

CCNV and HHS initially agreed that certain repairs would be conducted in early June, 1985. On May 15, 1985, CCNV distributed a letter to the shelter residents, alerting them that one-half of the building would be evacuated on June 1, 1985, to allow renovations. CCNV, apparently worried about unfavorable reports concerning CCNV and the shelter residents, also included in the letter a warning to shelter residents that CCNV would not tolerate any behavior "that can be used to discredit this place."

On May 21, 1985, representatives from HHS, the D.C. Government, and CCNV met to discuss arrangements for the operation and renovation of the shelter. At this meeting the federal officials made clear to CCNV that they had different plans than those prepared by Mr. Levenson. On May 31, 1985, HHS and CCNV met to further discuss the renovations. The two groups sharply disagreed as to the scope and timing of the shelter renovations.

CCNV did not see the GSA plans until June 7, 1985. In the meantime, on June 4, 1985, after CCNV relations with HHS had become somewhat hostile, Mitch Snyder wrote to President Reagan, asking that he meet with CCNV to resolve the dispute. On June 6, 1985, HHS Under Secretary Charles Baker responded, stating the government's position that CCNV should permit GSA to begin renovating the shelter on the basis of its oral descriptions of the planned renovations. On June 6, 1985, Mr.

Snyder wrote to Secretary Heckler, stating that:

by Tuesday, June 11th, we must have your architectural drawings and your assurance that the work will begin by June 15th. If you do not meet this schedule, then we must insist that you promptly arrange to take responsibility for the daily operation of the shelter.

As previously noted, the next day, June 7, 1985, GSA delivered to CCNV its plans for renovating the shelter.

On June 11, 1985, a meeting was held to discuss the GSA plans for renovating the shelter. It was clear at this meeting that the plans were not acceptable to CCNV.

The parties having arrived at loggerheads, plaintiffs on June 17, 1985, filed the original complaint in this case, seeking to compel defendants to (1) honor the November, 1984, statement, or (2), in the alternative, to assume responsibility for the operation of the shelter.

On June 21, 1985, Dr. Vieth announced that the federal government had decided to close the shelter. The stated reasons for this decision were CCNV's refusal to allow GSA to carry out the proposed renovations, HHS's inability to find an appropriate organization to operate the shelter, and the deplorable condition of the building. Plaintiffs thereafter applied for a temporary restraining order to enjoin defendants from posting notices of the future closing of the shelter. On Saturday, June 22, 1985, Judge Gesell of this Court, after a hearing on plaintiffs' application for a temporary restraining order, issued an order enjoining defendants from posting notices of the proposed shelter.

At a status conference held on July 25, 1985, this member of the Court established a schedule designed to expedite the resolution of this important case. Counsel for the plaintiffs indicated to the Court that, due to the press of other business, she would encounter difficulty in meeting that schedule. Counsel nonetheless agreed to the schedule. To ensure that the Court received the benefit of complete briefing of the issues representing both sides of this dispute, the Court, with the consent of the

parties, appointed *amici curiae* for assistance with the legal issues.[3]

On June 26, 1985, plaintiffs filed an Amended Complaint challenging defendants' decision to close the shelter. Defendants thereafter filed the motion to dismiss or, in the alternative, for summary judgment, which was opposed by plaintiffs. On July 15, 1985, the Court held a hearing on the motion.

*D. The Remand to HHS for Subsequent Proceedings, and the Agency's Final Decision.*

The next day, July 16, the Court issued an order remanding this case to HHS to conduct further notice and comment proceedings concerning any action to be taken with regard to the shelter. The Court directed HHS to report to the Court by July 31, presenting a reasoned analysis for the agency's decision. The Court scheduled a status conference for August 2, and, on July 26, 1985, the Court issued a temporary restraining order, enjoining defendants from closing the shelter until further judicial proceedings. As shown below, this remand caused defendants to modify their decision to close the shelter, and to commit substantial federal funds to assist various groups in their efforts to relocate the shelter residents.

Pursuant to the Court's remand Order, defendants posted notices in the shelter seeking comments, which were to be sent to Dr. Vieth. HHS received several hundred comments. The Task Force also arranged for an inspection of the building by the Public Health Service, which was conducted on July 27, 1985. That inspection revealed exactly what every party to this case agrees to—that the building is substantially deteriorated, and generally unfit for human inhabitation. See Joint Stipulation at 2, ¶ 10.

On July 31, 1985, Dr. Vieth issued a lengthy memorandum to Charles D. Baker, Under Secretary of HHS. This memorandum, which was signed by Under Secretary

Baker, described the history of CCNV's involvement with the shelter, summarized the comments received, and analyzed the issues. Dr. Vieth then identified five possible courses of action concerning the shelter:

A. Leave the shelter open in its present condition.

B. Leave the shelter open and renovate it in accordance with the GSA plans.

C. Leave the shelter open and renovate it with some more elaborate plan (*e.g.*, the Levenson plan).

D. Close the shelter immediately.

E. Close the shelter effective on some date in the near future to permit the residents to locate alternative shelter arrangements.

After analyzing each of these choices, Dr. Vieth recommended option E to Under Secretary Baker. Vieth recommended "that the effective date of the shelter's closing be delayed until August 31, 1985, in order to permit the Task Force to exhaust all reasonable efforts to make alternative shelter arrangements." Vieth Memorandum at 25. Vieth also recommended that the $2.7 million, which was previously earmarked for the GSA renovations of the building, be made available for relocating the shelter residents.

In a memorandum dated July 31, 1985, Under Secretary Baker adopted Dr. Vieth's recommendation. This is now the final decision of the agency. The parties have submitted supplemental memoranda addressing this decision. Defendants have supplemented their still-pending motion to dismiss, and plaintiffs have filed another motion for partial summary judgment, seeking to enjoin the closing of the shelter, and to compel the defendants to make sufficient repairs to allow the shelter to remain open during the cold winter months. These motions must be viewed in the context of plaintiffs' Amended Complaint. Accordingly, after describing that Amended Complaint, the Court considers the pending motions.

---

**3.** On August 2, 1985, attorneys from the law firm of Convington & Burling entered an appearance on behalf of plaintiffs. Thereafter, the

Court informally excused *amici,* who depart with the Court's gratitude for their helpful and professional assistance.

### E. The Amended Complaint.

As noted, plaintiffs amended their complaint after defendants initially decided to close the shelter, effective July 1. The Amended Complaint contains ten counts. The Court briefly describes the counts in the order in which they are analyzed in this Opinion.

Count four asserts a violation of plaintiffs' First Amendment rights of freedom of speech and to petition the Government for a redress of grievances. Count five notes that most shelter residents are black, and charges defendants with invidious discrimination against the residents on the basis of their race, presumably in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment. Plaintiffs' sixth count asserts that defendants' failure to honor Secretary Heckler's statement and defendants' efforts to close the shelter violate the Constitutional obligation of the Executive to "take Care that the Laws be faithfully executed...." *See* U.S. Const. art. II, § 3.

Count nine alleges a deprivation of plaintiffs' private property without just compensation or due process of law. *See* U.S. Const. amend. V. Although plaintiffs in this count claim an entitlement to just compensation, they do not seek damages. Instead, plaintiffs contend that just compensation, "in the context of this case, means alternative shelter." Plaintiffs' Memorandum Opposing Defendants' Motion, and in Support of Plaintiffs' Motion for Partial Summary Judgment, at 59.

Count ten states that the proposed closing is of no force and effect because the shelter residents are tenants, and thus entitled to 30 days notice to quit.

Counts three and eight are based on theories of contract law. Count three asserts that Secretary Heckler's statement constituted a contract, and seeks specific performance or other injunctive relief. This count also contains language suggesting

that plaintiffs might seek relief under a theory of promissory estoppel. Plaintiffs' eighth cause of action challenges the decision to close the shelter as a breach of defendants' "contract" with CCNV, stating that the shelter residents are intended third party beneficiaries of that "contract".

Three of the counts are based on the Administrative Procedure Act. Counts one and two seek to compel defendants to honor Secretary Heckler's November 4, 1984, statement, and charge defendants with agency action unlawfully withheld, and with unlawful agency action, pursuant to 5 U.S.C. §§ 706(1) and 706(2), respectively. Plaintiffs' seventh cause of action attacks the decision to close the shelter as "arbitrary and capricious, an abuse of discretion, and otherwise inconsistent with law."

In its prayer for relief, plaintiffs' Amended Complaint seeks declaratory and injunctive relief, as well as reasonable attorneys fees and costs, and, expenses of litigation.

## THE COURT DISMISSES COUNTS FOUR, FIVE, AND SIX BECAUSE THEY FAIL TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED

On July 5, 1985, defendants moved to dismiss plaintiffs' fourth, fifth, and sixth causes of action, which allege violations of plaintiffs' First Amendment rights, equal protection, and the Executive obligation to faithfully execute the laws, respectively, for failure to state claims upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6). Plaintiffs' opposing memoranda fails to specifically address any issues with respect to these counts, but merely states that "[t]he remaining issues [presumably including those relevant to these counts] cannot be decided without resolution of material factual disputes." Plaintiffs then refer the Court to their Statement of Genuine Issues, submitted pursuant to Local Rule 1–9(i). That document does not contain any facts which could possibly be considered relevant to these counts.[4] The Court ac-

---

**4.** The Court is concerned about the propriety of attempting to address defendants' motion to dismiss these counts merely by referring to Plain-

tiffs' Statement of Genuine Issues. This Statement is supposed to contain material *facts,* not law. *See* Local Rule 1–9(i). Therefore, such

cordingly treats defendants' motion with respect to these counts as conceded. *See* Local Rule 1–9(d). For the above reasons, the Court dismisses these counts.

■ Furthermore, the Court agrees with defendants that, in the context of this case, these counts are frivolous. Count four alleges a violation of plaintiffs' First Amendment rights of freedom of speech and to petition the government for redress of grievances. There is no indication in this record, even after examining plaintiffs' Statement of Genuine Issues, that defendants have somehow infringed upon plaintiffs' First Amendment rights. Indeed, given the notoriety of this lawsuit, all indications are to the contrary.

■ Count five states that most of the shelter residents are black, and charges the government with invidious discrimination. There is no allegation that plaintiffs have been treated differently from similarly situated individuals, and the absence of such an allegation is fatal to this count. *See Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506 (1964).

■ Count six alleges that defendants have violated the Constitution by refusing to faithfully execute the laws of this nation. *See* U.S. Const. art. II, § 3. As noted *supra* pp. 1268–1269 n. 4, the Court is unaware of a private right of action created by this section of the Constitution. The Court will not give this cause of action any further consideration.

In sum, these counts do not belong in this lawsuit. The Court dismisses them.

## BECAUSE PLAINTIFFS HAD AN OPPORTUNITY TO COMMENT ON THE PROPOSED SHELTER CLOSING, THEY HAVE NOT BEEN DEPRIVED OF PROPERTY WITHOUT DUE PROCESS OF LAW

■ Plaintiffs' ninth cause of action asserts that defendants, in deciding to close the building, without providing alternative shelter to the residents, have violated plaintiffs' Due Process rights. In support of this claim, plaintiffs assert that "[t]he tenancy interest of CCNV and the residents is a constitutionally protected property interest." Amended Complaint at 21. The defendants contend that plaintiffs have no protectible property interest in the continued operation of the shelter. Because the facts of this case clearly demonstrate that plaintiffs were provided with all of the process that was due, the Court dismisses this count without deciding the difficult issue concerning whether plaintiffs possess a property interest in the continued operation of the shelter.

In *Williams v. Barry,* 490 F.Supp. 941 (D.D.C.1980), *aff'd,* 708 F.2d 789 (D.C.Cir. 1983), a group of homeless persons sued the D.C. Government to enjoin it from closing two shelters. Judge Flannery of this Court held that plaintiffs possessed a protectible property interest in their shelter residency based on the following factors: the Mayor's Press Statement that "shelter is a basic human right", the Government's policy statement that "anyone who requests, or, is in apparent need of, shelter is entitled to it", and the establishment of a Commission on Homelessness. *See* 490 F.Supp. at 942–43, 946. In a later unpublished opinion, however, Judge Flannery

Statements are inappropriate places to respond to *legal* points raised by a party. An example of such a legal point, noted *infra* p. 1269, is defendants' contention in their Memorandum that there exists no express or even implied private right of action created by the Constitutional language that the Executive shall faithfully execute the Laws, referred to in count six. No amount of facts can address this point; plaintiffs must cite legal authority to refute this prop-

osition. They should not cite legal authority in the factual Rule 1–9(i) Statement. In any event, *none* of plaintiffs' filings contain any factual or legal authority in support of count six, which must be dismissed. The Court must remind counsel that before signing a pleading filed in the federal courts, a lawyer is obligated to make "reasonable inquiry [that] it is well grounded in" law and fact. Fed.R.Civ.P. 11.

held that the Fifth Amendment only required notice of a planned closing and a reasonable opportunity to present written comments. *Williams v. Barry*, No. 80–1104 (D.D.C. June 8, 1982).

Plaintiffs appealed Judge Flannery's conclusion that they were only entitled to written notice and comment procedures. The District did not cross appeal. Because defendants did not cross appeal, the Court of Appeals did not resolve the question of whether the statements and actions of the City officials created any constitutionally cognizable entitlement. *Williams v. Barry*, 708 F.2d 789, 792 (D.C.Cir.1983).[5] The Court of Appeals affirmed Judge Flannery's conclusion that plaintiffs were entitled only to "particularized notice detailing the reasons for the proposed closing and a reasonable opportunity to submit written responses to the proposal." *Id.* at 791. The Court rejected plaintiffs' contentions that they were entitled to an oral hearing or to a written statement of the reasons for the final decision, noting that the decision to close the shelter was legislative in nature. *Id.*

Plaintiffs in this case have received all of the procedural protections held adequate in *Williams*. Pursuant to the Court's remand Order, defendants have posted notices at the shelter inviting written comments. The Court finds that this procedure afforded plaintiffs "notice of the planned closing and a reasonable opportunity to present written comments" held sufficient in *Williams*, 708 F.2d at 791. Moreover, although *Williams* held that a statement of the reasons for defendants' decision was not constitutionally required, *see id.* at 791–92 and n. 3, defendants issued such a statement of reasons in this case. Accordingly, plaintiffs have received all of the process that they are due, and the Court grants summary

judgment for defendants on count nine of the Amended Complaint.

## BECAUSE THE SHELTER RESIDENTS ARE NOT "TENANTS", THE COURT MUST DISMISS COUNT TEN, WHICH CLAIMS A VIOLATION OF D.C. EVICTION LAW

■ Plaintiffs' complaint asserts that "the residents of the shelter and CCNV are tenants and therefore are entitled to 30 days notice to quit." Amended Complaint at 21. Defendants have moved for summary judgment on this count, asserting that the residents are not tenants, and thus are not entitled to 30 days notice. The Court agrees with defendants.

Defendants' well-reasoned argument of the law, based on the undisputed facts, may be summarized in the following fashion. The District of Columbia Code provides that landlords must give "tenants", even tenants at will or by sufferance, 30 days notice to quit. D.C.Code §§ 45–1403 and 45–1404. The Code defines a "tenant" as a person "entitled" to occupy a "rental unit". *Id.* § 45–1503(30). A "rental unit", in turn, is defined as a housing accommodation "which is rented or offered for rent...." *Id.* § 45–1503(27). Because the government never sought nor received any rent for the use of the shelter, the shelter is not a rental unit. Thus plaintiffs, occupants of the shelter, are not tenants. Plaintiffs, therefore, are not entitled to 30 days notice to quit.

Defendants support this position with case law. In *Tamamian v. Gabbard*, 55 A.2d 513, 514–15 (D.C.1947), the D.C. Municipal Court of Appeals held that a rent-paying "roomer", who was a "tenant" within the meaning of the D.C. Emergency Rent Act, was not a "tenant" for other purposes under the Code, and, therefore, was not entitled to notice to quit. In *Smith v. Town Center Management*

---

**5.** In his concurring opinion, Judge Bork stated that, "[h]ad there been a cross appeal, I think it highly likely that no process would have been found due," and further that, "[n]o one has plausibly maintained that there is a constitutional or other legal right to city-provided shelter." 708 F.2d at 793. Judge Bork reasoned that these conclusions were compelled by the fact that the Mayor's decision to close the shelters was "a wholly political one," and thus unreviewable.

*Corp.,* 329 A.2d 779, 780 (D.C.1974), the D.C. Court of Appeals held that a person allowed to live in an apartment rent-free was not entitled to any notice to quit. Rather than a tenant, she was "a permissive user or licensee who, upon being asked to leave, became a trespasser." *Id.* Like the plaintiffs in these cases, defendants assert, CCNV and the shelter residents are not entitled to any notice to quit.

Defendants find further support for this conclusion in the legal relationship that at one time *did* exist between the various parties. The only legally cognizable interest which CCNV had in the shelter was a license, assigned to it by the D.C. Government, which expired on March 31, 1984. Joint Stipulation at 3, ¶¶ 13, 15. At no time could plaintiffs claim the status higher than that of a licensee, and now, *over sixteen months after their license has expired,* plaintiffs cannot even make that claim.[6]

In response to this detailed argument, plaintiffs merely assert that the nature of their legal relationship with defendants depends upon the resolution of facts. Citing absolutely no legal authority, plaintiffs state that the existence of such a *"de facto tenancy"* is a question of fact. Plaintiffs also baldly claim that CCNV's payment of utilities could constitute the "hirings" required to create a tenancy at sufferance under D.C.Code § 45–220.

In the absence of any legal authority which can demonstrate how the facts which plaintiffs intend to prove at trial could entitle them to 30 days notice, the Court must agree with defendants that plaintiffs are not tenants. Based on the undisputed facts, count ten of the Amended Complaint can provide no relief to plaintiffs, and the Court grants summary judgment for defendants.

**THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' COUNTS THREE AND EIGHT, WHICH ARE BASED ON CONTRACT, BECAUSE SUCH CLAIMS ARE COMMITTED TO THE EXCLUSIVE JURISDICTION OF THE CLAIMS COURT**

■ Plaintiffs' third cause of action asserts that Secretary Heckler's "commitment" of November 4, 1984, "constitutes a contractual obligation to the plaintiffs which ... the Court should enforce by ordering specific performance or other injunctive relief." Amended Complaint at 18. Plaintiffs' eighth cause of action, which challenges defendants' decision to close the shelter, claims that such decision "is unlawful because it is a breach of defendants' contractual obligation to CCNV and the intended third-party beneficiaries, the residents of the shelter." *Id.* at 20. The Court concludes that it has no jurisdiction to consider these counts because the United States Claims Court has exclusive jurisdiction over these contractual claims against the United States in excess of $10,-000. The Court also treats as abandoned any contention by plaintiffs that the defendants are obligated by a theory or promissory estoppel to honor their "commitment".

First, although plaintiffs consistently refer to Secretary Heckler's statement as a "commitment" rather than a contract, the language of the Amended Complaint is clear: these two counts clearly are "at their essence" contract claims. *See Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C.Cir.1982).

■ Second, because these federal officials are sued in their official capacity, these contractual counts are to be construed as ones against the United States. *See* 14 C. Wright, A. Miller, and E. Cooper, *Federal Practice and Procedure* (hereafter "Wright and Miller") § 3655 (2d ed. 1985). Because this is a suit against the

---

**6.** The Court notes that defendants announced the decision to close the shelter on July 31, which was 31 days before the effective date of the closing. Therefore, even assuming *arguendo* that plaintiffs are entitled to 30 days notice, this announcement might seem sufficient. Because the parties have not addressed the issue of whether the service of such notice was adequate, the court does not rule on this contention. *See* D.C.Code § 45–1406.

United States, the United States must have consented to suit in this court to establish jurisdiction. *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983); *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). The United States has consented to suit in actions based on contract through the Tucker Act, 28 U.S.C. §§ 1346(a) and 1491. *Mitchell*, 103 S.Ct. at 2967. The Tucker Act, however, represents the *only* waiver of sovereign immunity on contract claims. *See id.; Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 893 n. 2 and 895 (D.C.Cir.1985); 14 Wright and Miller § 3657, at 274.

Thus, because these counts are contract claims against the United States, jurisdiction in this Court must be found in the Tucker Act. Plaintiffs, however, have now conceded "that there is no Tucker Act jurisdiction." Plaintiffs' Memorandum Opposing Defendants' Motion, and in Support of Plaintiffs' Motion for Partial Summary Judgment, at 28. Because these are contract claims against the United States, and because jurisdiction over such claims must be based on the Tucker Act, plaintiffs' admission that there is no Tucker Act jurisdiction lays to rest the contractual claims found in plaintiffs' counts three and eight.[7]

In addition to raising a claim based on a theory of contract law, count three of plaintiffs' Amended Complaint may also be interpreted to make a claim of promissory estoppel. The defendants moved to dismiss this count, insofar as it raises a claim of promissory estoppel, noting that the Ninth Circuit has concluded that the United States has not waived its sovereign immunity with respect to this type of claim. *See Jablon v. United States*, 657 F.2d 1064, 1070 (9th Cir.1981). Plaintiffs have not opposed this contention, and did not even address the promissory estoppel issue. Plaintiffs, therefore, have effectively abandoned this count, and the Court must treat it as conceded. *See* Local Rule 1–9(d). The Court declines to further address this issue without adversarial briefing[8], particularly because promissory estoppel claims against the government present "novel and difficult issues concerning subject matter jurisdiction and waiver of sovereign immunity." *National Juvenile Law Center, Inc. v. Regnery*, 738 F.2d 455, 466–67 (D.C.Cir. 1984).

In sum, plaintiffs' counts three and eight must be dismissed for the reasons heretofore stated.

THE COURT MUST RULE FOR DEFENDANTS ON PLAINTIFFS' APA CLAIMS BECAUSE DEFENDANTS' DECISION TO CLOSE THE SHELTER AND SPEND $2.7 MILLION TO RELOCATE THE RESIDENTS IS BASED ON A REASONED ANALYSIS

The remaining counts of plaintiffs' Amended Complaint are based on the Administrative Procedure Act. These APA counts are the crux of this litigation. Plaintiffs' count one charges that defendants' refusal to honor Secretary Heckler's November 4, 1984, statement constitutes agency action unlawfully withheld. 5 U.S.C. § 706(1). In count two, plaintiffs

---

7. Even without this concession by plaintiffs, the Court must arrive at the same conclusion. There is no dispute that, for contract claims against the United States in excess of $10,000, the Court of Claims has *exclusive* jurisdiction. *Van Drasek v. United States*, 762 F.2d 1065, 1069 (D.C.Cir.1985); *Megapulse*, 672 F.2d at 963–64 n. 13. Although plaintiffs do not seek money damages as such, these contract claims would easily require the expenditure of that sum. Insofar as plaintiffs seek equitable, injunctive or specific relief, their claims might not succeed in any court. *See generally Spectrum Leasing*, 764 F.2d at 893–95; *Maryland Department of Human Resources v. Department of Health and Human Services*, 763 F.2d 1441 (D.C.Cir.1985).

8. *Amici* briefed this issue, "in case it may be of use to the Court or the parties at some point in the proceedings", Memorandum of *Amici Curiae* at 9, concluding that promissory estoppel claims are within this Court's jurisdiction. Despite this briefing, the Court must ask more of plaintiffs than to simply ignore one of their causes of action when faced with a motion to dismiss. It would be an abuse of the Court's discretion to refuse to invoke Local Rule 1–9(d) in this situation, where plaintiffs have not even responded to the Motion to Dismiss in major part, despite its being filed more than six weeks ago, well over the ten days required by the Rules to respond. *See* Local Rule 1–9(d).

state that defendants' plans for the shelter, in light of the Secretary's statement, constitute unlawful agency action. 5 U.S.C. § 706(2). The seventh cause of action challenges the decision to close the shelter on the grounds that it is arbitrary and capricious, an abuse of discretion, and otherwise "inconsistent" with law. *Id.*

The government defends against these APA claims on three fronts. First, as to counts one and two, defendants assert that this Court lacks subject matter jurisdiction. Second, defendants contend that the decision to close the shelter is wholly "committed to agency discretion by law", 5 U.S.C. § 701(a)(2), and thus unreviewable. Third, defendants state that, even assuming jurisdiction and reviewability, their decision must be upheld under the narrow standard of judicial review because that decision is based on a reasoned analysis. The Court considers these points in turn, and, as shall become clear, the Court agrees with defendants only as to this last contention.

*A. This Court has Jurisdiction Over Plaintiffs' APA Claims.*

Defendants allege that there are fatal jurisdictional defects in plaintiffs' counts one and two, claiming that this case does not come within the APA's waiver of sovereign immunity. As developed below, the Court disagrees with defendants on this complex issue because plaintiffs' action does not seek monetary relief, and because the Tucker Act does not preclude the assertion of jurisdiction.

The APA represents a broad waiver of sovereign immunity, but defendants quickly point out that the APA withdraws that waiver where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. As in *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 970–71 (D.C.Cir.1982), the government here contends that the relief sought by plaintiffs is tantamount to a request for specific performance of a "contract", which relief is prohibited by the Tucker Act. Thus, defendants conclude that the APA waiver of sovereign immunity does not apply. The Court rejects this contention.

The Court of Appeals for this Circuit recently set forth the proper analytical framework for this jurisdictional problem. *See Maryland Department of Human Resources v. Department of Health and Human Services*, 763 F.2d 1441, 1446 (D.C. Cir.1985). This Court has jurisdiction over the APA claims pursuant to 28 U.S.C. § 1331 if: (1) the relief sought is within the APA's waiver of sovereign immunity, which is limited to actions "seeking relief *other than monetary damages*", 5 U.S.C. § 702 (emphasis supplied), and (2) the Tucker Act does not preclude the invocation of section 702's waiver of sovereign immunity or the assertion of general federal question jurisdiction, 28 U.S.C. § 1331, over plaintiffs' claims. *Maryland Department of Human Resources*, 763 F.2d at 1446.

■ The APA does not operate as a waiver of sovereign immunity in actions seeking money damages. 5 U.S.C. § 702. Although the requested relief under counts one and two, which seek to compel defendants to make substantial renovations to the building, would require the expenditure of money by the government, it is clear that plaintiffs are seeking *specific* monetary relief, not damages. This distinction, which is clearly noted in *Maryland Department of Human Resources*, 763 F.2d at 1446–48, means that plaintiffs have satisfied prong one of the analysis. The Court now turns to prong two.

Cases against the United States involving over $10,000, such as this one, are committed by the Tucker Act to the exclusive jurisdiction of the United States Claims Court if they are (a) contract claims, or (b) "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. §§ 1491(a)(1) and 1346(a)(2); *Maryland Department of Human Resources*, 763 F.2d at 1448. "There is a complex and not completely uniform body of case law dealing with when and to what extent the presence of Tucker Act jurisdiction precludes the availability of relief under the APA." *Maryland Department of Human Resources*, 763 F.2d at 1449. To sift

through this complex case law to determine whether the Tucker Act precludes the APA's waiver of sovereign immunity, the Court must examine whether the APA counts present (a) contract claims, and whether they present (b) statutory claims for damages.

Although plaintiffs' third and eighth causes of action are clearly based on an alleged breach of contract, and, as previously discussed, are thus beyond the jurisdiction of this Court, these APA claims are not so clearly founded on a contract for the purposes of the Tucker Act. *See Spectrum Leasing,* 764 F.2d at 893 ("A court will not find that a particular claim is one contractually based merely because resolution of that claim requires *some* reference to a contract."); *Megapulse,* 672 F.2d at 971 (same). Plaintiffs' APA claims primarily attack an agency action which conflicts with that agency's prior decision. For this reason, the Court is convinced that these are not merely " 'disguised' contract claims." *Megapulse,* 672 F.2d at 969.

Furthermore, plaintiffs' APA claims in this case are more analogous to the cessation of a grant than a typical government contract. In *Maryland Department of Human Resources,* a claim based on a grant was held to be within the district court's jurisdiction. As the Court of Appeals for this Circuit stated just this year:

> To be sure, Maryland's request for an injunction enjoining HHS from withholding funds is somewhat analogous to a request for specific performance of a contract that obliges the promisor to pay money. But we have found no case in which the contract claims provision of the Tucker Act has been held applicable to a dispute between a state and the federal government over the "contractual" rights and obligations of the "parties" to a federally funded program. Although the principles of contract law undoubtedly have a role to play in such disputes, [citation omitted], *we see no reason to assume that what is involved here is a contract within the meaning of the Tucker Act.* As the Supreme Court recently noted, "[u]nlike normal contractual undertakings, federal grant

programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Kentucky Department of Education* [——— U.S. ———], 105 S.Ct. 1544, 1552 [84 L.Ed.2d 590] (1985).

763 F.2d at 1449.

In addition to not being disguised government contract claims, plaintiffs' APA claims also are not within Tucker Act jurisdiction over statutory or constitutional claims. The Supreme Court has declared that for such jurisdiction to exist under the Tucker Act, plaintiffs must rely on a substantive source of law that " 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.' " *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983) (quoting *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976)). Because in this case there clearly is no statutory or constitutional provision which, standing alone, commands the payment of money, *see United States v. Connolly,* 716 F.2d 882, 887 (Fed.Cir.1983), *cert. denied,* ——— U.S. ———, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984), plaintiffs' APA claims are not within this section of Tucker Act jurisdiction. Therefore, because the Tucker Act does not apply, it cannot preclude the invocation of the APA's waiver of sovereign immunity over plaintiffs' claims. *See Maryland Department of Human Resources,* 763 F.2d at 1446.

Accordingly, plaintiffs' APA claims are not precluded by the Tucker Act. Thus, this Court has jurisdiction pursuant to the APA and 28 U.S.C. § 1331, only, assuming these APA claims are otherwise properly subject to judicial review. The Court next considers whether the defendants' decision with respect to the shelter is reviewable under the APA.

B. *Because There is Ample "Law to Apply" to Defendants' Decision to Close the Shelter, that Decision is Reviewable Under the APA.*

 Defendants contend that the decision to close the shelter is unreviewable

under the APA because that is a decision "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). *See generally Heckler v. Chaney*, —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (*"Overton Park"*); *Falkowski v. EEOC*, 764 F.2d 907 (D.C.Cir.1985). As shown below, however, the Court finds that there exists "law to apply", *Overton Park*, 401 U.S. at 410, 91 S.Ct. at 821, in both the Heckler statement and the Community Services Block Grant Act, 42 U.S.C. § 9910. Accordingly, plaintiffs' APA claims are reviewable and within the Court's subject matter jurisdiction.

■ "[T]he Supreme Court has traditionally not been sympathetic to arguments that judicial review is not available under the APA." *American Friends Service Committee v. Webster*, 720 F.2d 29, 39 (D.C.Cir.1983). Section 701(a)(2)'s exception to the general rule of judicial reviewability "is a very narrow exception." *Overton Park*, 401 U.S. at 410, 91 S.Ct. at 820. It precludes judicial review only where "there is no law to apply." *Id.* The Supreme Court recently held that this exception is presumed to govern agency decisions not to enforce a statute, comparing such decisions to unreviewable decisions by prosecutors to refuse to prosecute. *Chaney*, 105 S.Ct. at 1656. In light of *Chaney*, the Court of Appeals for this Circuit has held that the Justice Department's decision not to provide counsel for a governmental employee was "analogous to deciding whether to enforce a statute", and thus unreviewable. *Falkowski v. EEOC*, 764 F.2d at 911.

*Chaney* and *Falkowski* involved discretionary agency decisions to refuse to commit limited agency resources to a course of action. In this case, had the government in the first instance refused to act upon CCNV's request to renovate the shelter, these precedents might operate to preclude judicial review. The case at bar, however, concerns a decision to close the shelter in violation of an undisputed prior statement to make at least some renovations. Accordingly, this situation is distinguishable

from the decisions at issue in *Chaney* and *Falkowski*.

The Supreme Court made this distinction clear in *Motor Vehicle Manufacturer's Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (*"State Farm"*). That case involved a challenge to the National Highway Safety Administration's revocation of a regulation. Rejecting a claim that the decision was not reviewable, the Court stated:

[R]evocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency's former views as to proper course.... Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.

463 U.S. at 41–42, 103 S.Ct. at 2866. *Accord, Ventura Broadcasting Co. v. FCC*, 765 F.2d 184, 191 (D.C.Cir.1985); *Massachusetts Fair Share v. Law Enforcement Assistance Administration*, 758 F.2d 708, 711 (D.C.Cir.1985). Such a requirement— that the agency adequately explain its change of course—is necessary to protect the honor and integrity of the government, because, without such a requirement, the government should be held to its word. *Molton, Allen and Williams, Inc. v. Harris*, 613 F.2d 1176, 1181 (D.C.Cir.1980).

This requirement is not limited to published rules or regulations. Retired Circuit Judge Wilkey in *Molton, Allen and Williams*, while distinguishing the Supreme Court decision in *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), held that, under the circumstances of that case, an oral commitment could be enforced against the government to restore the honor and credit of the government. *See* 613 F.2d at 1181. "This precept is rooted in the concept of fair play ... and its ambit is not limited to rules attaining the status of formal regulations." *Massachusetts Fair Share*, 758 F.2d at 711. *See also, e.g., Yellin v. United*

*States,* 374 U.S. 109, 123, 83 S.Ct. 1828, 1836, 10 L.Ed.2d 778 (1963) (a committee's internal rules); *United States v. Heffner,* 420 F.2d 809, 811 (4th Cir.1970) (an IRS news release); *Kent Farm Co. v. Hills,* 417 F.Supp. 297, 301 (D.D.C.1976) (an informal policy).

The Court also finds that, although Secretary Heckler's statement of November 4, 1984, provides "law to apply", rendering reviewable the decision to depart from the statement, the parties' dispute as to the extent of the governmental commitment is immaterial. As noted, defendants claim that the government only agreed to perform the seven tasks listed in the November 4, 1984, statement. Plaintiffs contend that the government promised more, such as single person cubicles.

█ It remains undisputed, however, that the government *did* change its course based on a variety of reasons. Such a change of course is subject to a limited and narrowly prescribed standard of judicial review. *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866. If rationally based, the decision to close the shelter must be sustained under the APA's arbitrary and capricious standard. *Id.*[9] Such review generally is conducted solely on the basis of the administrative record. *Overton Park,* 401 U.S. at 420–21, 91 S.Ct. at 825–26. Under these circumstances, the dispute as to the scope of the commitment is immaterial.

The Court also finds "law to apply" in the standards of the Community Services Block Grant Act. This Act provided the source of the Secretary's authority to utilize funds for renovations of the shelter. *See* 42 U.S.C. § 9910. Although an agency's decision *not* to provide funds pursuant to that Act in the first instance might not be reviewable, *International Union, United Automobile, Aerospace & Agricultural*

*Implement Workers of America v. Donovan,* 746 F.2d 855, 862 (D.C.Cir.1984), the Court agrees with plaintiffs that the decision to rescind such funds [10] is reviewable.

Accordingly, both the Heckler statement and the funding Act provide law to apply in reviewing this decision, which is subject to the familiar arbitrary and capricious standard. The Court now turns to this inquiry.

*C. The Defendants' July 31, 1985, Decision is Based on a Reasoned Analysis, and Must be Sustained.*

█ The Court must examine whether the government's decision is based on a "reasoned analysis." *State Farm,* 463 U.S. at 42, 103 S.Ct. at 2866. The Court must uphold the agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court's review under this "standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866; *Center for Auto Safety v. Peck,* 751 F.2d 1336, 1342 (D.C.Cir.1985). The Court must determine "whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867 (quoting prior decisions). A review of the agency's reasoning for its decision to close the shelter, providing $2.7 million to assist its residents in relocation, demonstrates that it survives this level of scrutiny.

The reasons for the agency's decision in the instant case appear in the July 31, 1985, memoranda exchanged between Dr. Vieth and Under Secretary Baker. In his 26 page memorandum to Baker, which the Under Secretary signed, Vieth thoroughly an-

---

9. Assuming reviewability, the parties agree that the decision to close the shelter is to be measured against the arbitrary and capricious standard. *See* Plaintiffs' August 9, 1985, Memorandum at 6; Defendants' August 9, 1985, Memorandum at 16.

10. Because defendants have decided to use the funds already designated for renovations to as-

sist in the relocation of the shelter residents, it might be improper to characterize the re-channelling of these funds as a "rescission". Nonetheless, the Court will examine the record and the defendants' reasons for their decision upon this Court's remand to the relevant agency to see if the intended use of these funds comports with the standards of the Act.

alyzed all of the issues and options before the Task Force.

Vieth identified five possible options. These were: (A) to leave the shelter open in its present condition, (B) to leave the shelter open and renovate it in accordance with the GSA plans, (C) to leave the shelter open and renovate it in accordance with some more elaborate plan, such as the plan by plaintiffs' hired architect, Mr. Levenson, (D) to close the shelter immediately, and (E) to close the shelter effective on some date in the near future to permit the residents to locate alternative shelter arrangements. Vieth also noted that the agency had the option to provide funds to assist in the undertaking of the relocating the residents of the shelter.

After considering these courses of action, Vieth chose option (E), recommending to close the shelter on August 31, and to provide $2.7 million of federal funds toward dispersing and relocating the residents. Baker responded in a three page memorandum, adopting Vieth's recommendation. It is clear that the Court must look to both documents, and to the supporting papers which constitute the administrative record, to determine the basis for the agency's decision.

The most serious dispute between the parties concerns the lack of alternative shelter space in the city. The Second Street shelter is by far the biggest such facility in Washington. Although the estimates differ as to the exact number of homeless who sleep at the shelter each night, for the purposes of this decision it is sufficient to note that the shelter regularly is used by several hundred suffering and truly needy persons. As of right now, it appears that there exists inadequate space in other shelters to house the current residents of the Second Street shelter. Under Secretary Baker concluded that "[o]nly a final decision to close the shelter soon will bring forth the development of adequate alternative shelter capacity before the onset of winter." Baker Memorandum at 2.

Plaintiffs attack this reason for closing the shelter as irrational. They refer to it as a "political game of chicken", which will merely send the residents out into the cold. See Plaintiffs' August 7, 1985, Memorandum at 14. There is no need to resort to this sort of invective. Plaintiffs' contention ignores the critical aspect of the July 31 decision: defendants will provide up to 2.7 million dollars to the District Government or to other shelter providers to prepare and equip shelter space and appropriate facilities for the residents of the Second Street shelter. The Court must admit that without this funding, it would have grave reservations about upholding the decision to close the shelter. But this is not a problem now before the Court. The fact remains that defendants have agreed to spend these funds, and this crucial funding may be just the cure for the problem that has plagued the Court in its study of this serious problem in this case, which began in mid-June, 1985, namely, the lack of alternative shelter space. Given this funding obligation, this is certainly not an irrational decision.

There is other sound reasoning supporting the decision. Dr. Vieth stated the belief of the federal government that homelessness is a local problem, and that state and local governments should ultimately be responsible for providing for the needs of the homeless. To achieve the involvement of the D.C. Government, Vieth determined that the shelter must be closed, because it is undisputed that the D.C. Government has refused to become involved in this undertaking until the shelter is closed and this litigation is concluded. Vieth noted that in the long run, federal funding is not enough, and that the shelter could not "be operated safely, humanely, or effectively without the involvement and operational support of local authorities. The D.C. Government's unwillingness to become involved with CCNV and this shelter probably doomed this project from the start." Vieth Memorandum at 24. The Court agrees.

Plaintiffs attack this reasoning, stating that the Secretary's statement in November 4, 1984, was not conditioned on involvement by the local government. The record throughout this ordeal does disclose, how-

ever, federal efforts to involve the D.C. Government. HHS issued its license to the District, not to CCNV. HHS officials made clear to Mitch Snyder that the District bore the primary responsibility for housing the homeless. *See* Heckler Statement of November 4, 1984; Vieth letter to Snyder, August 14, 1984. These efforts have proven unsuccessful, and the federal government realizes that the D.C. Government will not operate this shelter. The federal officials have decided to achieve the proper involvement by providing funds to the local government and private shelter operators in an effort to relocate the residents. If the Court were to make this decision in the first instance, it might have chosen a different tactic to achieve local government involvement. In light of the Court's limited power in this case, however, it cannot say that this decision lacks a rational basis.

Further support for the agency's reasoning, insofar as it concerns the role of the D.C. Government, is found in the Community Services Block Grant Act, the source of the $2.7 million. *See* 42 U.S.C. § 9910. That Act does not authorize funding of projects merely designed to create or renovate physical structures. It does, however, authorize funding of "special programs of assistance to private, locally initiated community development programs which sponsor enterprises providing employment and business development opportunities for low-income residents of the area." 42 U.S.C. § 9910(a)(2)(A). This Act provides a rational basis for a decision not to pour funds into an old, deteriorated building, but instead to support local government and private groups to help these disadvantaged persons.

Dr. Vieth and Under Secretary Baker also relied on the undisputedly deplorable condition of the building in deciding to close it. The administrative record reveals that the Task Force arranged an inspection of the building by the Public Health Service. That inspection, conducted on July 27, 1985, noted the inadequate plumbing and sanitation facilities, poor cleaning and maintenance, infestation by rats, roaches, and other insects, etc. Plaintiffs attack this as a reason for closing the shelter, stating that the deteriorated condition of the shelter means only that defendants must renovate it. The Court disagrees. The abominable state of the structure compels the conclusion that the building must not remain in its current condition and use. This, in turn, compels at least two rational choices: (1) fix the shelter, as plaintiffs demand, or (2) evacuate it and relocate the residents, as defendants have decided. Defendants considered both of these options, but plaintiffs disagree with their choice. The APA contains no mandate that defendants make the choice plaintiffs seek. *MCI Telecommunications Corp. v. FCC*, 675 F.2d 408, 413 (D.C.Cir.1982). Defendants here have made a rational choice, which the Court will not disturb.

Vieth and Baker also cite the inability to find a suitable operator for a shelter of this size, and GSA's opinion that adequate renovations could not be concluded before the winter season. Plaintiffs dispute the adequacy of defendants' search for other shelter operators, and point out that CCNV is willing to operate it. It is clear, however, that the problems surrounding this shelter have been greatly publicized. Still, no group has come forward to volunteer to operate it. And, as demonstrated by plaintiff Snyder's June 6, 1985, letter to Secretary Heckler, it is equally clear that CCNV is not willing to operate the shelter unless the government agrees to perform the demanded renovations.[11] Similarly, there is no basis to dispute GSA's determination that proper renovations could not be completed before the advent of winter. Under these circumstances, the decision to close the shelter is a sound one.

Another reason for the decision is found in the statutory source for funding, the Community Services Block Grant Act, 42 U.S.C. § 9910(a)(2)(A). A total of $19,920,000 is available for such programs nation-

---

11. While CCNV's willingness to operate the shelter through the winter is commendable, the human beings at the facility need and deserve

more than CCNV now appears to be able to provide.

wide. *See* Pub.L. No. 98–619, 98 Stat. 3305, 3319 (1984). Given this limitation, it would be difficult to justify making the repairs urged by plaintiffs, the cost of which are estimated at $10 million, on *one* building in *one* city, where it is clear that this is a national problem.

The memoranda before the Court are replete with further reasons for HHS's decision. The memoranda note the breakdown of the relationship with CCNV. The Task Force also foresees the likelihood of unwarranted future HHS expenditures on the shelter, even if revovated now. Dr. Vieth also noted a disagreement among authorities as to whether it is appropriate to house together as many people as now reside in the shelter. He concluded that, given this disagreement, "this is precisely the sort of decision which should be left to the local authorities and experts." Vieth Memorandum at 18. Vieth also noted the perceived increase in crime in the neighborhood of this shelter, which houses several hundred people each night, since its opening in January, 1984.

Taken together, these reasons provide a rational basis for defendants' decision to close the shelter, and to commit federal funds to assist in the residents' relocation. Because the decision was based on a "reasoned analysis", *State Farm*, 463 U.S. at 42, 103 S.Ct. at 2866, the Court will not disturb it, subject to relocating these people at once and before the winter months. This temporary World War II building certainly does not provide a place now fit for human habitation. Defendants are entitled to summary judgment on these APA counts.

## CONCLUSION

This case concerns a governmental response to what is truly an emergency. Defendants herein have made clear their belief that the problem of homelessness is essentially a local one. Perhaps that conclusion is correct. That perception would not, however, justify closing this huge shelter for homeless persons without any governmental commitment to see that the residents are given adequate shelter before the winter begins. The Court notes that just this week, the governor of at least one state of this nation, faced with a natural disaster such as a flood, tornado, or hurricane, has declared certain areas to be disaster areas, invoking federal, state, and private aid. Relief efforts for disasters such as those, which are not totally dissimilar to the plight of the homeless in this city, depend on governmental leadership. That is exactly what is called for in this case: governmental leadership. The Court will hold the government to its obligation to offer assistance to relocate the shelter residents, and any party to this case may petition the Court, through the Clerk of the Court, to reopen this case in the event that they feel that the government is not fulfilling that duty. The Court also expresses the precatory desire that the government of the District of Columbia will participate in this initiative to help relocate these people.

The Court realizes that the problem of the homeless in this city and throughout the nation cannot be solved by the government alone. There is only enough money in the federal budget to scratch the surface. Nevertheless, as in the case of a ravaging flood, tornado, or hurricane, no less than the President of the United States should treat this as a national emergency, and call upon the captains of industry, health care professionals, members of the medical and psychiatric professions, and others skilled in job training and counseling in order that the full impact of the nation's resources can be brought to bear to eliminate this national disgrace. It is hoped that the focus on this case will result in a joint and combined effort of the public and private sectors of our great nation to meet the unmet needs of these people who, as President Reagan stated last year in one of his major television addresses, are some of the "truly needy" for whom the government exists. As previously stated, if this can be done in cases of natural disasters, it can also be done for those who have no constituency. The Court hopes that many if not most of these individuals can be reclaimed and restored to their rightful

place as taxpayers and self-respecting members of society.

The Court has entered an Order of this date granting defendants' motion, and denying plaintiffs' motion.

### ORDER

In accordance with the Court's Opinion of even date herewith, and for the reasons and analysis therein set forth, it is, by the Court, this 19th day of August, 1985,

ORDERED that plaintiffs' motion for partial summay judgment be, and the same hereby is, denied; and it is

FURTHER ORDERED that defendants' motion to dismiss be, and the same hereby is, granted as to counts three, four, five, six, and eight; and it is

FURTHER ORDERED that defendants' motion for summary judgment be, and the same hereby is, granted as to counts one, two, seven, nine, and ten; and it is

FURTHER ORDERED that this case shall stand dismissed from the dockets of this Court, without costs to either party, but the parties may make a written application to the Clerk of Court, by way of a pleading and not a letter, within thirty (30) days from the date hereof to reopen or for the appointment of a Special Master, if the defendants herein do not act with dispatch in coming up with reasonable alternatives so as to meet the entire needs of each and every resident of the shelter at Second and D Streets, N.W., Washington, D.C.; and it is

FURTHER ORDERED that the defendants may reclaim the shelter and begin the process of transferring its residents to other suitable facilities in the Washington, D.C., area as soon as feasible, but only after devising appropriate interim and long range plans to eliminate homelessness in the Nation's Capital, and to provide humane solutions for these needy and in all too many instances helpless human beings.